# EXHIBIT 12



**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

Thurgood Marshall U.S. Courthouse    40 Foley Square, New York, NY 10007 Telephone: 212-857-8500

**MOTION INFORMATION STATEMENT**

Docket Number(s): 17-346 _____    _____ Caption [use short title] _____

Motion for: Emergency stay pending appeal, and    United States of America v. Galanis (Archer)

expedite briefing/consideration of the appeal.

Set forth below precise, complete statement of relief sought:

(1) A stay of the Southern District of New York's

January 31, 2017 order, which prohibited appellant

from filing a motion to quash; (2) a temporary

emergency stay pending consideration of appellant's

stay motion; and (3) expedite briefing and

consideration of the merits appeal.

| | |
|---|---|
| MOVING PARTY: Devon Archer | OPPOSING PARTY: United States of America |
| ☐ Plaintiff    ☑ Defendant | |
| ☐ Appellant/Petitioner    ☐ Appellee/Respondent | |
| MOVING ATTORNEY: Matthew L. Schwartz | OPPOSING ATTORNEY: Rebecca Mermelstein / Brian Blais / Aimee Hector |

[name of attorney, with firm, address, phone number and e-mail]

Boies Schiller & Flexner LLP, 575 Lexington Avenue, New York, NY 10022    United States Attorney's Office, S.D.N.Y., One St. Andrew's Plaza, New York, NY 10007

Tel: (212) 446-2300    Tel.: (212) 637-2521/2203/2360

E-mail: mlschwartz@bsfllp.com    E-mail: rebecca.mermelstein@usdoj.gov; brian.blais@usdoj.gov; aimee.hector@usdoj.gov

Court-Judge/Agency appealed from: S.D.N.Y. - Hon. Ronnie Abrams

**Please check appropriate boxes:**

Has movant notified opposing counsel (required by Local Rule 27.1):
☑ Yes ☐ No (explain): _____

Opposing counsel's position on motion:
☐ Unopposed ☑ Opposed ☐ Don't Know
Does opposing counsel intend to file a response:
☑ Yes ☐ No ☐ Don't Know

Is oral argument on motion requested? ☑ Yes ☐ No (requests for oral argument will not necessarily be granted)

Has argument date of appeal been set? ☐ Yes ☑ No  If yes, enter date: _____

**FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUNCTIONS PENDING APPEAL:**

Has request for relief been made below? ☑ Yes ☐ No
Has this relief been previously sought in this Court? ☐ Yes ☑ No
Requested return date and explanation of emergency: _____

February 6, 2017, unless the Court grants an

emergency stay.  The District Court in this

matter imposed only a temporary stay of 72

hours to allow appellant to file this motion.

**Signature of Moving Attorney:**
/s/ Matthew L. Schwartz ___ Date: Feb. 6, 2017 _____    Service by: ☑ CM/ECF ☐ Other [Attach proof of service]

**Form T-1080** (rev. 12-13)

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Appellee, | |
| -against- | No. 17-346 |
| DEVON ARCHER, | |
| Defendant-Appellant. | |
| IN RE: DEVON ARCHER, | |
| Petitioner, | No. 17- |

**EMERGENCY MOTION FOR A STAY PENDING APPEAL
AND FOR EXPEDITED BRIEFING**

In the week between Christmas and New Year's, the government obtained a search warrant under the Stored Communications Act ("SCA") for five accounts hosted by two internet service providers, Google and Apptix. Google provided notice that it had received a search warrant, and indicated that its policy was to produce responsive records unless it was given proof that a formal objection or motion to quash had been filed. Because the accounts in question contained literally

thousands of attorney-client communications but the warrants put absolutely no restrictions on the search of privileged materials, among other reasons, Mr. Archer moved to compel production of the unredacted warrant (which had never been sealed), and to stay the execution of the warrant pending a motion to quash. But the government – despite recently arguing to this Court that a motion to quash an SCA warrant is entirely proper – contended that such a motion was "unprecedented." The District Court (Hon. Ronnie Abrams, *J.*) agreed, declining to "allow a pre-execution motion."

Mr. Archer therefore appeals in order to challenge warrants that are deficient on their face. Mr. Archer also seeks a stay pending appeal, in order to preserve the privilege over literally thousands of attorney-client communications that are potentially responsive to the warrants, as well as his rights under the Fourth and Sixth Amendments. At approximately 5:32 PM on Friday, February 3, 2017, the District Court denied a stay, but afforded Mr. Archer 72 hours in which to seek relief from this Court. Accordingly, Mr. Archer filed this emergency motion for (a) a stay pending appeal; (b) an emergency temporary stay while

this Court hears the motion; and (c) expedited briefing of the merits appeal.

## RELEVANT FACTS

On December 28, 2016, the government obtained warrants to collect content from two accounts associated with Mr. Archer, hosted by Google and Apptix, respectively. *See* Decl. ¶ 5; Ex. A.[1] The warrants sought the production of all emails in each account from between January 1, 2014 and May 11, 2016, as well as essentially all non-email content associated with those accounts, including all Google Drive, Google Docs, Google Slides, Google Chats, and other stored data, as well as location data, internet browsing history, on-line shopping transaction records, among other things. Ex. A.[2]

---

[1] Citations to "Decl." are to the Declaration of Matthew L. Schwartz, dated February 6, 2017. References to exhibits refer to exhibits to the Schwartz Declaration.

[2] This is an extraordinary breadth of data, most of it having nothing to do with email. Google Drive, for example, allows users up to 15 GB of cloud-based storage – it is Google's version of Dropbox. Likewise, Google maintains web browsing history for all activity in its Chrome browser. Ex. E, at ¶¶ 4(b)(i)-(xix); *see also* Google Privacy Policy, https://www.google.com/policies/privacy/.

Although the warrants were not filed under seal, Mr. Archer was unaware of them until the evening of January 26, 2017, when Google provided notice that it had received a search warrant (the "Google Warrant") and that, per company policy, it would produce responsive documents unless he filed an objection or motion to quash. Google also provided a redacted version of the warrant. *See* Decl. ¶ 2; Ex. A.

The next day, Mr. Archer filed a letter motion in the District Court seeking an order (a) compelling the government to produce copies of the warrant and application, and (b) enjoining Google from producing responsive data until Mr. Archer had a chance to review it and move to quash. *See* Decl. ¶ 4. Mr. Archer principally argued that the Google Warrant was (even in redacted form) deficient on its face, and that it was procedurally proper to move to quash a warrant obtained under the Stored Communications Act. He further argued that a motion to quash was especially appropriate because the accounts contained literally thousands of attorney-client communications.

In its response, the government disclosed that in addition to the Google Warrant, it had obtained a warrant based on the same application for another account associated with Mr. Archer, from the

service provider Apptix (the "Apptix Warrant," and with the Google Warrant, the "Warrants"). *See* Decl. ¶ 5; Exs. C, D. The government also disclosed that it had already received responsive information from Apptix, and that it therefore did not oppose producing the unredacted Warrants and application – although it did not produce them at that time. *See* Decl. ¶ 8.

On January 31, 2017, the parties appeared before the District Court. At that conference, the Court orally denied Mr. Archer's motion. Agreeing with the government's argument that procedurally entertaining a motion to quash a search warrant would be "unprecedented," the Court declined "to allow a potential pre-execution motion." *See* Ex. B, at 18.[3]

As directed at the conference, Mr. Archer filed a written motion for a stay pending appeal before noon the following day. By order dated Friday, February 3, 2017, at approximately 5:32 PM, the Court denied a

---

[3] The District Court denied the motion to compel as moot because the government agreed to produce the Warrants and supporting application. It finally did so the next morning, about two and a half hours before Mr. Archer's motion for a stay pending appeal was due to be filed. Accordingly, counsel for Mr. Archer did not have a meaningful opportunity to review them prior to filing.

stay, but gave Mr. Archer 72 hours to seek a stay pending appeal from this Court. *See* Decl. ¶ 12; Ex. F.

## ARGUMENT

### A. Legal Standard

This Court considers four criteria when deciding whether to issue a stay pending appeal under Federal Rule of Appellate Procedure 8: "the likelihood of success on the merits, irreparable injury if a stay is denied, substantial injury to the party opposing a stay if one is issued, and the public interest." *Mohammed v. Reno*, 309 F.3d 95, 100-01 (2d Cir. 2002). "Applying this test, [courts have] granted a stay pending appeal where the likelihood of success is not high but the balance of hardships favors the applicant. . . . [T]he probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury [movant] will suffer absent the stay. Simply stated, more of one excuses less of the other." *Reno*, 309 F.3d at 101 (2d Cir. 2002) (citations omitted).[4]

---

[4] Rule 8 provides that stays in criminal appeals are governed by Rule 38 of the Federal Rules of Criminal Procedure. *See* Fed. R. App. P. 8(c). But Rule 38 is concerned only with a stay of various aspects of a criminal sentence or "disability" created by a conviction or sentence.

**B.    The Order Should Be Stayed Pending Appeal**

The District Court's order denying Mr. Archer the ability to make a motion to quash should be stayed.  The government has argued to this very court that a motion to quash an SCA warrant is procedurally proper, meaning that Mr. Archer is certain to succeed on the merits. And in the absence of a stay, he will be irreparably injured by the government's invasion of the attorney-client privilege – an invasion that the Supreme Court has found, in some cases, can justify dismissal of an indictment, *see United States v. Morrison*, 449 U.S. 361 (1981) – as well as his Fourth and Sixth Amendment rights.

**1.    Mr. Archer Will Be Irreparably Injured Absent A Stay**

Mr. Archer will be hopelessly prejudiced if his request for a stay is not granted.  "The attorney-client privilege . . . is key to the constitutional guarantees of the right to effective assistance of counsel and a fair trial."  *United States v. Neill*, 952 F. Supp. 834, 839 (D.D.C. 1997).  Yet the accounts that are the subject of the Warrants contain

---

For other situations, courts have looked to the *Mohammed v. Reno* factors, *e.g., U.S. v. Ghailani*, No. 98-cr-1023, 2010 WL 1816010, at *4 (S.D.N.Y. May 5, 2010), and the government below agreed that was the appropriate standard here.

approximately 9,000 attorney-client communications, and the Warrants have absolutely no restriction on the search and seizure of attorney-client communications, let alone a protocol to protect them. *See* Decl., ¶¶ 13-14; Exs. C-D. When the government acquires privileged communications – as it indisputably will here – they presumptively are conveyed to the prosecution team. *See Neill*, 952 F. Supp. at 840. Thus, the government's future investigative steps, its trial strategy, and its questioning of witnesses will all be tainted by privileged communications.

The District Court concluded that this "alleged injury to Archer . . . is not actual and imminent." Ex. F, at 2. But that was clearly erroneous; the injury to Mr. Archer does not stem only from the potential use as evidence of attorney-client communications – the violation of the privilege is itself a concrete and irreparable injury. "[I]t matters little whether the intrusion occurred prior to the initiation of formal adversary proceedings, because the right to a fair trial could be crippled by government interference with the attorney-client privilege long before the formal commencement of a criminal proceeding." *Neill*, 952 F. Supp. at 839. Because the Warrants contain absolutely no

8

prohibition on the search and seizure of privileged communications, they permit the government to obtain and conduct a file-by-file search through tremendous amounts of data which, once seen, it cannot un-see.

The government has suggested it can ameliorate any prejudice by use of a "taint team" – government personnel not directly associated with the case tasked with "protecting" Mr. Archer's privilege. *See also* Ex. F, at 2. But it is well-established that a warrant must rise or fall on its face; the government's offer cannot save an invalid warrant or cure the prejudice. *See Groh v. Ramirez*, 540 U.S. 551, 557 (2004).

Further, a "taint team" would not mitigate the irreparable injury to Mr. Archer. Taint teams are premised on trusting the government to screen itself from information it will naturally desire. Courts have therefore repeatedly called them into question, both because of their failure to prevent the inadvertent disclosure of privileged information, *see In re Grand Jury Subpoenas*, 454 F.3d 511 (6th Cir. 2006), and because their very appearance is problematic, *see In re Search Warrant for Law Offices Executed on Mar. 19, 1992*, 153 F.R.D. 55, 59 (S.D.N.Y. 1994) (noting that "reliance on the implementation of a Chinese Wall,

especially in the context of a criminal prosecution, is highly questionable, and should be discouraged," and that "[i]t is a great leap of faith to expect that members of the general public would believe any such Chinese wall would be impenetrable").

In this case, the tremendous volume of data that the Warrants authorize the government to review will make it necessary for the government to utilize significant resources to analyze it, almost surely including non-lawyers. *See id.* ("[I]n a case such as this the Chinese Wall attorney to perform the search required the physical assistance of agents, laborers, truckmen, and others not bound by the ethical considerations which affect a lawyer."). *See also* Ex. E, at ¶ 23 (warrant application, indicating that the government intends for non-lawyer technicians, among others, to review responsive data).

The inevitable problems taint teams present have led at least one Circuit to hold that a district court committed reversible error by allowing the government to utilize one. *See In re Grand Jury Subpoenas*, 454 F.3d at 523 (noting that taint teams present "inevitable, and reasonably foreseeable risks" and have "been implicated . . . in leaks of confidential information to prosecutors," and

that "human nature being what it is, occasionally some taint-team attorneys will make mistakes or violate their ethical obligations").

Indeed, even those cases the government relied upon in the District Court appear wary of taint teams. *See, e.g., U.S. v. Hunter,* 13 F. Supp. 2d 574, 583 & n.2 (D. Vt. 1998) ("It may be preferable for the screening of potentially privileged records to be left not to a prosecutor behind a 'Chinese Wall,' but to a special master or the magistrate judge.").

The prejudice to Mr. Archer is self-evident: "the government's fox is left in charge of [Mr. Archer's] henhouse, and may err by neglect or malice, as well as by honest differences of opinion." *In re Grand Jury Subpoenas*, 454 F.3d at 523.

## 2. The Government Will Not Be Prejudiced By A Stay

The government will not be prejudiced by a stay pending appeal. No trial date has been set and trial is not likely to take place for many months, so there is no urgency for the government to immediately review responsive documents. Nor is there a risk of evidence loss or spoliation: upon receiving a request from law enforcement, the SCA requires service providers to copy all responsive data. *See* 18 U.S.C.

§ 2703(f); *see also* Google Transparency Report, https://goo.gl/LS5Saq (describing policy of copying responsive data before notifying subscriber of legal process).

In holding that a stay would injure the government, the Court instead pointed to "the interest of the public and criminal defendants in the prompt resolution of criminal cases." Ex. F, at 3. But in this case, Mr. Archer obviously consents to any delay occasioned by his motion to quash, and the Sixth Amendment analysis focuses exclusively on prejudice to the defendant. *See Doggett v. United States*, 505 U.S. 647, 661 (1992). Likewise, Congress has determined that any public interest in a speedy trial is outweighed by the need for defendants to make, and courts to consider, appropriate motions (and interlocutory appeals). *See* 18 U.S.C. §§ 3161(h)(1)(C) & (D).[5]

The other purported injuries advanced by the government below (but apparently not accepted by the District Court) are no more convincing. First, it argued that it intended to take additional investigative steps based upon a review of the search warrant

---

[5]     That said, Mr. Archer has no desire to needlessly delay trial. For that reason, he respectfully requests expedited consideration of this appeal.

materials. But this argument is circular, for it depends on their having the right to review those materials in the first place. The government has no legitimate interest in taking investigative steps premised on an unconstitutional search, and the District Court agreed that any additional steps the government took were taken at its own risk. Ex. B, at 18; *see also In re Grand Jury Subpoenas*, 454 F.3d at 517 (recounting government's acknowledgement that any steps following improper review of privileged evidence would result in *Kastigar*-like evidentiary hearings and taint issues).

The government also argued that allowing Mr. Archer to make a motion to quash would create bad precedent for other cases. This is far from compelling. *See U.S. v. $22,050.00 U.S. Currency*, 595 F.3d 318, 325 (6th Cir. 2010) ("The government also argues that setting aside default here would create bad precedent that would 'undermine' the entire civil forfeiture system, leading to all potential claimants and their attorneys ignoring properly served forfeiture claims. Chicken Little would be proud of this logic."). In any event, as explained below, the government itself has recently urged this "precedent."

### 3. The Public Interest Favors A Stay

Generally, the harm to the opposing party and public interest factors merge when the government is involved. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). Accordingly, because the government will suffer no prejudice from a stay, the public interest favors granting one. Moreover, both the public and the government have an interest in ensuring the protection of the Fourth and Sixth Amendments and the attorney-client privilege. *See Verizon N.Y. Inc. v. Village of Westhampton Beach*, Nos. 11-cv-252 and 11-cv-213 (AKT), 2013 WL 5762926, at *9 (E.D.N.Y. Oct. 18, 2013).

### 4. Mr. Archer Is Likely To Succeed On The Merits Of This Appeal

Finally, Mr. Archer can demonstrate a strong likelihood of success on the merits of this appeal – more than strong enough to justify a stay, especially given the one-sided balance of hardships. Indeed, the government has very recently argued to this Court that a motion to quash a warrant obtained under the SCA is procedurally proper. The District Court's failure to entertain such a motion is therefore reversible error.

### a. This Court Has Jurisdiction Over This Appeal

As a threshold matter, the District Court found that Mr. Archer did not have a likelihood of success on the merits because, in part, "appellate jurisdiction is, at best, uncertain." Ex. F, at 2. But this Court has jurisdiction under 28 U.S.C. §§ 1291 and 1292. And even if that were not so, this would be an appropriate case in which to grant mandamus.

*First*, interlocutory appeals necessary to preserve the attorney-client and other privileges may be heard under 28 U.S.C. § 1291. To obtain appellate review of a subpoena,[6] "the subpoenaed person ordinarily must defy the district court's enforcement order, be held in contempt, and then appeal the contempt order, which is regarded as final under § 1291." *In re Air Crash at Belle Harbor*, 490 F.3d 99, 104 (2d Cir. 2007) (quotation omitted). "In some instances, however, the obligation to submit to contempt is excused because 'the purposes

---

[6]     As explained below, the government has argued that an SCA warrant functions as a "hybrid" between a subpoena and a search warrant. For purposes of this appeal, an SCA warrant's subpoena-like characteristics – insofar as they compel a service provider to gather and produce responsive records, rather than authorize federal agents to seize the evidence themselves – are most relevant.

underlying the finality rule require a different result.'" *U.S. v. Punn*,

737 F.3d 1, 5 (2d Cir. 2013) (quoting *Belle Harbor*, 490 F.3d at 105).  As

this Court explained:

> One such instance, the "*Perlman Exception*,"
> takes its name from the Supreme Court decision
> describing it, *Perlman v. United States,* 247 U.S.
> 7 (1918). . . . The *Perlman* decision has come to
> stand for the principle that the holder of an
> asserted privilege may immediately appeal the
> enforcement of a subpoena when the subpoena is
> directed at another person who does not object to
> providing the testimony or documents at
> issue. . . . The rule is justified by the fact that a
> subpoenaed party is unlikely to risk contempt in
> order to protect a privilege that is not his own.

*Id.* at 5-6 (quotation omitted); *see also In re Grand Jury Subpoenas*, 123

F.3d 695, 696-97 (1st Cir. 1997) ("[W]hen subpoenaed documents are in

the hands of a third party, . . . the owner of the documents may seek

immediate appeal of a district court's order requiring production of those documents.").[7]

Here, rough searches of just the emails in the two relevant accounts reveal that they contain approximately 9,000 documents within the Warrants' date range that potentially implicate the attorney-client privilege. *See* Decl. ¶¶ 13-14. This fact renders the District Court's order effectively unreviewable on appeal from a final judgment because the order "involves an asserted right the legal and practical value of which would be destroyed if it were not vindicated before trial." *Lauro Lines s.r.l. v. Chasser*, 490 U.S. 495, 498-99 (1989); *see also U.S. v. Lavender*, 583 F.2d 630, 632-33 (2d Cir. 1978) ("Where a claim of privilege is involved appellate courts cannot always repair the error once the cat is out of the bag." (internal quotation marks omitted)).

---

[7]     In *Mohawk Industries, Inc. v. Carpenter*, 558 U.S. 100 (2009), the Court held that, generally speaking, disclosure orders adverse to attorney-client privilege are not immediately appealable. *Mohawk* did not purport to overrule *Perlman*, however, and this Court has explicitly declined to address the impact of *Mohawk* on *Perlman*. *See In re Grand Jury Subpoenas*, 628 F. App'x 13, 14 (2d Cir. 2015). Meanwhile, numerous other courts have continued to apply the *Perlman* doctrine. *E.g., In re Grand Jury Subpoena*, 642 F. App'x 223, 225 (4th Cir. 2016); *U.S. v. Tucker*, 745 F.3d 1054, 1067 (10th Cir. 2014); *In re Sealed Case*, 716 F.3d 603, 610 (D.C. Cir. 2013); *In re Grand Jury*, 705 F.3d 133 145 (3d Cir. 2012).

Accordingly, under *Perlman*, the order is immediately appealable under section 1291.

*Second*, even if the *Perlman* doctrine did not apply, this Court has jurisdiction under 28 U.S.C. § 1292(a)(1), which permits an interlocutory appeal from any order refusing to grant an injunction. Because Mr. Archer's motion sought to prevent Google and the government from taking certain actions while he made a motion to quash, it was in the nature of a request for injunctive relief. Indeed, this is how the District Court characterized it. *See* Ex. B, at 5 ("you are asking for something akin to a stay").

Interlocutory appeals from orders refusing to grant injunctions are not subject to the collateral order bar. *See U.S. v. Allen*, 155 F.3d 35, 39 (2d Cir. 1998). Because the order completely resolved Mr. Archer's request for injunctive relief, it is appealable under section 1292(a)(1). *See HBE Leasing Corp. v. Frank*, 48 F.3d 623, 632-33 (2d Cir. 1995). Furthermore, even if this appeal did not fall within the plain language of the statue, section 1292(a)(1) grants jurisdiction over appeals of orders that have the "practical effect" of refusing an injunction. *Volvo*

*N. Am. Corp. v. Men's Int'l Prof'l Tennis Council*, 839 F.2d 69 (2d Cir. 1988).

*Third*, even if jurisdiction were not proper under either section 1291 or 1292, Mr. Archer has simultaneously petitioned for a writ of mandamus pursuant to 28 U.S.C. § 1651. To obtain mandamus, "(1) the party seeking issuance of the writ must have no other adequate means to attain the relief it desires; (2) the issuing court, in the exercise of its discretion, must be satisfied that the writ is appropriate under the circumstances; and (3) the petitioner must demonstrate that the right to issuance of the writ is clear and indisputable." *In re The City of New York*, 607 F.3d 923, 932–33 (2d Cir. 2010). A writ of mandamus is particularly appropriate where a case "implicates a significant and novel question of law" and "resolving that issue will aid in the administration of justice," as it will "offer useful guidance to the district courts." *U.S. v. Prevezon Holdings Ltd.*, 839 F.3d 227, 237 (2d Cir. 2016)

The requirements for mandamus are present here. If this Court were to find that it otherwise lacks jurisdiction, mandamus would be the only means for Mr. Archer to obtain relief. *See S.E.C. v.*

*Rajaratnam*, 622 F.3d 159, 169 (2d Cir. 2010) ("Even though we lack interlocutory jurisdiction to review the district court's order, a writ of mandamus may still be appropriate . . . because no adequate alternative remedies are available.").

The issue presented by this appeal is also "novel and significant and its resolution will aid in the administration of justice." *Id.* The District Court, characterizing Mr. Archer's motion as "novel" and concerned with what it perceived as a lack of "authority in this circuit," stated that Mr. Archer was "essentially asking [it] to set a precedent . . . to allow a potential pre-execution motion," and based its order on the fact that it was "not willing at this time to take the novel step of blocking the execution of these warrants." Ex. B, at 18.

And lastly, for the reasons set forth herein, Mr. Archer is likely to prevail in his appeal, which demonstrates a "clear and indisputable right" to the writ.

> **b.    The Government Has Conceded In Other Litigation That A Pre-Execution Motion To Quash A Stored Communications Act Warrant Is Procedurally Appropriate**

At base, the District Court's order prevented Mr. Archer from even making a motion to quash an SCA warrant that was at no time under

seal.  The government, arguing that Mr. Archer's motion was "unprecedented" and "premature," effectively contended that there is no such thing as a motion to quash a search warrant, and that Mr. Archer's only remedy is a suppression motion.  The District Court agreed.  *See* Ex. B, at 18.

But not only is there precedent for a party moving to stay or quash a search warrant, the same U.S. Attorney's Office has recently argued to this very Court that doing so is appropriate in cases involving SCA warrants.  In *Microsoft v. United States*, the government argued that an SCA warrant is "not a conventional warrant" but instead "a hybrid: part search warrant and part subpoena."  The government continued:

> As the District Court correctly observed, an SCA warrant "is obtained like a search warrant when an application is made to a neutral magistrate who issues the order only upon a showing of probable cause" but then "is executed like a subpoena in that it is served on the [provider] in possession of the information and does not involve government agents entering the premises of the [provider] to search its servers and seize the e-mail account in question."

Government Brief, *In the Matter of a Warrant to Search a Certain E-mail Account Controlled and Maintained by Microsoft Corporation*, No. 14-2985 (2d Cir.) (ECF No. 212 at 23-24).  The government therefore

argued that the same checks that exist for subpoenas are appropriately employed to challenge SCA warrants:

> The act of gathering records by an entity with custody and control over those records does not amount to a government search or seizure at the time the records are gathered.
>
> This is not to say that there are no constitutional limits on the government's power to compel the disclosure of information. The Supreme Court has recognized that "subpoenas which suffer from too much indefiniteness or breadth" may be appropriately quashed."

*Id.* at 34-35 (quoting *Fisher v. U.S.*, 425 U.S. 391, 401 (1976)).

Far from asking for any novel relief, Mr. Archer seeks only the exact same procedure that the government agreed to in the Microsoft case. *See In re Warrant to Search a Certain E-Mail Account Controlled & Maintained by Microsoft Corp.,* No. 13-mj-2814, 2014 WL 4629624, at *1 (S.D.N.Y. Aug. 29, 2014) ("Microsoft immediately moved to stay execution of the Warrant pending review by the Court of Appeals. . . . [T]he Court extended the stay only for such period as will permit Microsoft to file its notice of appeal, request for a stay and request for an expedited appeal.").

Before the District Court, the government attempted to distinguish *Microsoft* because the challenge was brought by the service provider, rather than the account holder. But that is a distinction without a difference – either a warrant can be quashed prior to its execution or it cannot. There is no basis for holding that only certain parties that have standing to challenge a warrant can bring a motion to quash. The government also tried to argue that allowing a motion to quash a search warrant would create a dangerous precedent, interfering with the orderly administration of justice. But pre-execution challenges to search warrants have been routinely considered in numerous other contexts,[8] and as demonstrated above, no prejudice will flow to the government. In any event, every single subpoena – a far more common investigative tool – is potentially subject to a motion to quash, but that has not stopped the government from using subpoenas to do its job.

---

[8]  *See, e.g., In re Solomon*, 465 F.3d 114, 117 (3d Cir. 2006); *In re Search Warrant*, 810 F.2d 67 (3d Cir. 1987); *In re Inspection of Norfolk Dredging Co.*, 783 F.2d 1526, 1529 (11th Cir. 1986) ("the irreparable harm of the threatened unconstitutional search can be prevented prior to the warrant's execution"); *Brock v. Gretna Mach. & Ironworks, Inc.*, 769 F.2d 1110, 1111 (5th Cir. 1985).

In sum, the District Court should not have refused to allow Mr. Archer to make a motion to quash. The Federal Rules do not prohibit it, the case law does not prohibit it, and the government itself has recently affirmed that a motion to quash an SCA warrant is procedurally proper.

### c. Serious Issues With Both Warrants Necessitate Mr. Archer Being Afforded An Opportunity To Challenge Them

Finally, it is worth noting that in addition to being likely to succeed in his appeal of the order refusing to allow him to move to quash, Mr. Archer is also likely to succeed on his motion to quash when he is allowed to make it.

For example,[9] the Warrants do not satisfy the basic elements of particularity. They sought not only all e-mails for a nearly two-and-a-half-year period, but also the entire contents of the Google Drive and Picasa Web Albums associated with the same Google account; all internet browsing activity; all location data; and other broad categories of information, much of it having nothing to do with the crimes charged in this action. The Warrants also allowed the government unfettered

---

[9] This discussion of the Warrants' defects is by no means exhaustive, and by providing these examples Mr. Archer does not waive other bases on which to challenge the Warrants.

access to privileged information. The facial overbreadth of these Warrants render them unconstitutional general searches. *See generally U.S. v. Galpin*, 720 F.3d 436, 447 (2d Cir. 2013) ("There is . . . a serious risk that every warrant for electronic information will become, in effect, a general warrant, rendering the Fourth Amendment irrelevant. This threat demands a heightened sensitivity to the particularity requirement in the context of digital searches."); *U.S. v. Otero*, 563 F.3d 1127, 1132 (10th Cir. 2009) ("The modern development of the personal computer and its ability to store and intermingle a huge array of one's personal papers in a single place increases law enforcement's ability to conduct a wide-ranging search into a person's private affairs, and accordingly makes the particularity requirement that much more important.").

A review of the warrant application – which Mr. Archer did not have at the time he argued before the District Court – demonstrates even more clearly that the Warrants are defective. For example, all of the e-mails relied upon in the warrant application to supply probable cause were sent or received over two *years* before the government secured the Warrants, *see* Ex. E, at ¶¶ 12-20, rendering the probable

25

cause hopelessly stale.  *See generally Walczyk v. Rio*, 496 F.3d 139, 162 (2d Cir. 2007).

Additionally, the affidavit's showing of probable cause is based exclusively on e-mails.  Thus, the Warrants are not supported by probable cause for the wide-ranging fishing expedition through photo albums, payment data, cloud storage, location data, and other information they authorize.  Indeed, the application is entirely silent about those other kinds of data.[10]

## C.    The Court Should Order an Expedited Briefing Schedule

Finally, Mr. Archer respectfully requests that the Court also set an expedited briefing schedule for this appeal and put it on for argument or submission at the earliest practicable date.  Mr. Archer's interest is in returning to the District Court and being able to make his motion to quash the Warrants as soon as possible.

---

[10]    The only exception is photographs.  The application contains a boilerplate assertion that photographs may contain "the identities and locations of co-conspirators or victims."  But the application contains no reason to believe that such photographs exist.

## <u>CONCLUSION</u>

The Court should (a) stay the District Court's order pending appeal; (b) enter a temporary emergency stay while this motion is pending; and (c) order expedited briefing and consideration of this appeal.

Dated:  February 6, 2017
     New York, New York

        Respectfully submitted,

        BOIES, SCHILLER & FLEXNER LLP
        *Attorneys for petitioner Devon Archer*

        /s/ Matthew L. Schwartz
        Matthew L. Schwartz
        575 Lexington Avenue
        New York, New York 10022
        Tel.: (212) 446-2300
        E-mail: mlschwartz@bsfllp.com

**Federal Rules of Appellate Procedure Form 6. Certificate of Compliance With Type-Volume Limit**

Certificate of Compliance With Type-Volume Limit,
Typeface Requirements, and Type-Style Requirements

1. This document complies with [the type-volume limit of Fed. R. App. P. [*insert Rule citation; e.g., 32(a)(7)(B)*]] [the word limit of Fed. R. App. P. [*insert Rulecitation; e.g., 5(c)(1)*]] because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) [and [*insert applicable Rule citation, if any*]]:

   ☑ this document contains *5,163* words, **or**

   ☐ this brief uses a monospaced typeface and contains [*state the number of*] lines of text.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because:

   ☐ this document has been prepared in a proportionally spaced typeface using [*state name and version of word-processing program*] in [*state font size and name of type style*], **or**

   ☑ this document has been prepared in a monospaced typeface using Microsoft Word with Century Schoolbook size 14 font.

(s) _Matthew L. Schwartz_

Attorney for _Devon Archer_

Dated: _2/6/17_

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Appellee, | |
| -against- | No. 17-346 |
| DEVON ARCHER, | |
| Defendant-Appellant. | |
| | |
| IN RE: DEVON ARCHER, | |
| Petitioner, | No. 17- |

## DECLARATION OF MATTHEW L. SCHWARTZ

I, Matthew L. Schwartz, pursuant to 28 U.S.C. § 1746, declare as

follows

1.v    I am a partner in the law firm Boies Schiller & Flexner LLP,

counsel to Devon Archer.  I make this declaration in support of Mr.

Archer's motion for a stay pending appeal, and his simultaneously-filed

application for a writ of mandamus.  Except where otherwise noted, the

contents of this declaration are based on my personal knowledge.

1

2.v    On January 26, 2017, at approximately 7:30 PM, Google

notified Mr. Archer that it had received a search warrant for an account

associated with Mr. Archer (the "Google Warrant") and that, per

company policy, it would produce responsive documents unless Mr.

Archer filed a formal objection with the court.  Google also provided a

redacted copy of the warrant.  A true and correct copy of the redacted

warrant as I received it from Google is attached hereto as Exhibit A.

3.v    After receiving the redacted Google Warrant, I asked the

government to (a) produce an unredacted copy of the warrant and its

supporting application, and (b) ask Google to refrain from producing

responsive records until Mr. Archer had an opportunity to review the

warrant.

4.v    On January 27, 2017, after the government refused both of

these requests, Mr. Archer filed a motion in the District Court seeking

an order (a) compelling the government to produce copies of the warrant

and application, and (b) enjoining Google from producing data

responsive to the warrant until Mr. Archer had a chance to review the

unredacted warrant and move to quash it.  By letter that same day, co-

defendant Bevan Cooney joined in Mr. Archer's motion because he had

2

also received notice from Google that an account associated with him was the subject of a search warrant.

5.v    The government filed its opposition on January 30, 2017.  In its response, the government disclosed that in addition to the Google warrants described above, it had also obtained a warrant based on the same application for another account associated with Mr. Archer, from a service provider called Apptix (the "Apptix Warrant").   The government further disclosed that it had already received responsive information from Apptix, and that it therefore did not oppose producing the unredacted warrant and application.

6.v    To be clear, neither the Google Warrant nor the Apptix Warrant was ever filed under seal or was accompanied by a non-disclosure order, although the government has represented that the supporting affidavit was initially sealed.

7.v    On January 31, 2017, the parties appeared before the District Court (Hon. Ronnie Abrams, *J.*).  At that conference, the Court orally denied Mr. Archer and Mr. Cooney's motions.  A true and correct copy of the transcript from that argument is attached hereto as Exhibit B.

8.∨   Although the government had agreed to produce the unredacted warrants and application in their January 30, 2017 letter, it did not actually produce that material at or before the conference. At the January 31 conference, the Court ordered the government to produce that material via e-mail that day. In fact, however, the government was not able (apparently for technical reasons) to produce that material until approximately 9:21 AM on February 1, 2017.

9.∨   A true and correct copy of the unredacted Google Warrant – which relates to an account associated with Mr. Archer, an account associated with Mr. Cooney, and an account associated with a third person who has not been charged ("Individual-1") – is attached hereto as Exhibit C.

10.∨  A true and correct copy of the unredacted Apptix Warrant – which relates to an account associated with Mr. Archer and an account associated with Individual-1 – is attached hereto as Exhibit D.

11.∨  A true and correct copy of the supporting affidavit is attached hereto as Exhibit E.

12.∨  As directed by the District Court, Mr. Archer filed a written motion for a stay pending appeal by noon on February 1, 2017. Mr.

4

Cooney joined the motion. By order dated February 3, 2017, at approximately 5:32 PM, the District Court denied a stay pending appeal, but gave Mr. Archer and Mr. Cooney 72 hours in which to seek a stay pending appeal from this Court. A true and correct copy of the Court's order is attached hereto as Exhibit F.

13.v The account associated with Mr. Archer that is the subject of the Google Warrant contains at least 2,600 e-mails that fall within the warrant's date range that potentially implicate the attorney-client privilege because they have a lawyer somewhere on the e-mail chain.

14.v The account that is the subject of the Apptix Warrant contains approximately 6,300 e-mails that fall within the warrant's date range that potentially implicate the attorney-client privilege because they have a lawyer somewhere on the e-mail chain.

15.v Prior to being charged, Mr. Archer received a grand jury subpoena. In response to that subpoena, Mr. Archer produced hundreds of responsive e-mails from the accounts associated with him that are the subject of the Google Warrant and the Apptix Warrant, in addition to many other responsive documents. Mr. Archer produced responsive documents from those two accounts as recently as May 9, 2016 – the

5

day that the government filed (then under seal) its criminal complaint

in this matter, and two days before the defendants were arrested.


      I declare under penalty of perjury that the foregoing is true and

correct.

Dated:      February 6, 2017
            New York, New York

                    /s/ Matthew L. Schwartz
                    Matthew L. Schwartz

Ex. A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

# 16 MAG 8347

In the Matter of Warrants for All Content and
Other Information Associated with the Email
Accounts: ▮▮▮▮▮
darcher@rosemontseneca.com and
▮▮▮▮▮▮▮▮▮▮▮▮ Maintained at
Premises Controlled by Google; and
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮ USAO
Reference No. 2015R01447

## SEARCH WARRANT

TO:     Google ("Provider")

       Federal Bureau of Investigation ("Investigative Agency")

**1. Warrant.** Upon an affidavit of ▮▮▮▮▮▮▮▮▮ of the FBI, and pursuant

to the provisions of the Stored Communications Act, 18 U.S.C. § 2703(b)(1)(A) and

§ 2703(c)(1)(A), and the relevant provisions of Federal Rule of Criminal Procedure 41, the Court

hereby finds there is probable cause to believe the email accounts ▮▮▮▮▮▮▮▮▮

darcher@rosemontseneca.com, and ▮▮▮▮▮▮▮▮ maintained at premises

controlled by Google, contains evidence, fruits, and instrumentalities of crime, all as specified in

Attachment A hereto. Accordingly, the Provider is hereby directed to provide to the Investigative

Agency, within 30 days of the date of service of this Warrant and Order, the records specified in

Section II of Attachment A hereto, for subsequent review by law enforcement personnel as

authorized in Section III of Attachment A. The Government is required to serve a copy of this

Warrant and Order on the Provider within 14 days of the date of issuance.

The Warrant and Order may be served via electronic transmission or any other means through which the Provider is capable of accepting service.

Dated: New York, New York

_17/28/16_     _4:70r_
Date Issued         Time Issued

S/Barbara Moses

UNITED STATES MAGISTRATE JUDGE
Southern District of New York

Barbara Moses
United States Magistrate Judge
Southern District of New York

12.28.2016

## Email Search Attachment A

### I.    Subject Accounts and Execution of Warrant

This warrant is directed to Google (the "Provider"), headquartered at 1600 Amphitheatre Parkway, Mountain View, CA 94043, and applies to all content and other information within the Provider's possession, custody, or control associated with the email accounts ███████████████ darcher@rosemontseneca.com, and █████████████████████ (the "Subject Accounts").

A law enforcement officer will serve this warrant by transmitting it via email or another appropriate manner to the Provider. The Provider is directed to produce to the law enforcement officer an electronic copy of the information specified in Section II below. Upon receipt of the production, law enforcement personnel will review the information for items falling within the categories specified in Section III below.

### II.    Information to be Produced by the Provider

To the extent within the Provider's possession, custody, or control, the Provider is directed to produce the following information associated with the Subject Accounts from January 1, 2014 to May 11, 2016:

    i. *Email contents.* In general, any email (which can include attachments such as documents, images, and videos) sent to or from a subscriber's account, or stored in draft form in the account, is maintained on the Provider's servers unless and until the subscriber deletes the email. If the subscriber does not delete the email, it can remain on the Provider's computers indefinitely. Even if the subscriber deletes the email, it may continue to be available on the Provider's servers for a certain period of time.[3]

---

[3] Emails and attachments stored by a subscriber on a server maintained by the Provider may not necessarily be located on the subscriber's home computer. The subscriber may store emails or

     ii.   *Google Docs, Sheets, and Slides.*  Google provides users with the ability to write, edit, and collaborate on various documents with other Google users through a service called "Google Docs," "Google Sheets," and "Google Slides." Users can use Google Docs, Sheets, and Slides to create online documents that can be stored on or saved to the user's Google Drive.

     iii.   *Google Drive content.*  Google provides users with a certain amount of free "cloud" storage, currently 15 gigabytes, through a service called "Google Drive" (users can purchase a storage plan through Google to store additional content). Users can use their Google Drive to store email, attachments, videos, photographs, documents, and other content "in the cloud," that is online. A user can access content stored on Google Drive by logging into his or her Google account through any computer or other electronic device that is connected to the Internet. Users can also share files stored on Google Drive with others, allowing them to view, comment, and/or edit the files.

     iv.   *Google Chats and Hangouts content.*  Google allows subscribers to engage in "chat" sessions in an instant messaging format with other Google users, the transcripts of which are generally stored in a user's email content. Similarly, Google allows users to engage in enhanced chat sessions, called Hangouts, which permit the sharing of additional content such as videos, sounds, and images. In general, Hangouts content is stored separately from a user's email and chat content.

---

other files on that Provider's servers for which there is insufficient storage space in the subscriber's computer or which the subscriber does not wish to maintain on that computer. Additionally, a Provider may have kept emails or other files pursuant to a preservation letter even though the subscriber has deleted the emails or files. A search of the files in the computer in the subscriber's residence would therefore not necessarily uncover the files that the subscriber has stored on the Provider's servers.

     v.    *Address book.* The Provider also allows subscribers to maintain the equivalent of an address book, comprising email addresses and other contact information of other email users.

     vi.    *Subscriber and billing information.* Google collects and maintains (typically unverified) identifying information about each subscriber, including, for example, name, username, address, telephone number, and other email addresses associated with the account. Specifically, with regard to other email addresses associated with the account, Google maintains records regarding (1) recovery and (2) alternate email accounts, which can be used to sign in to the account and recover a password; (3) fetching and (4) forwarding addresses, which are email accounts from which the primary account receives emails and forwards emails, respectively; (5) domain aliases or (6) separate domains associated with the account, which are means by which accounts with other domain names can be associated with a primary account; (7) other Google accounts that have access to the primary account, which access can be granted by the user of the primary account; and (8) other email accounts that are associated with the primary account. Google also maintains records concerning the date on which the account was created, the Internet protocol ("IP") address of the user at the time of account creation, the current status of the account (*e.g.*, active or closed), the length of service, and the types of services utilized by the subscriber. Additionally, for paying subscribers, Google maintains records of the subscriber's means and source of payment, including any credit card or bank account number.

     vii.    *Transactional information.* The Provider also typically retains certain transactional information about the use of each account on its system. This information can include records of login (*i.e.*, session) times and durations and the methods used to connect to the account (such as logging into the account through the Provider's website).

3

viii.    *Customer correspondence.*   The Provider also typically maintains records of any customer service contacts with or about the subscriber, including any inquiries or complaints concerning the subscriber's account.

ix.    *Location data.*   Google maintains recent location data, collected periodically, from mobile devices that are logged into or have used applications (or "apps") or services provided by Google.   For example, Google collects information collected from GPS, Wi-Fi networks, cell site locations, and mobile networks to estimate a user's location.   Google apps and services also allow for location reporting, which allows Google to periodically store and use a device's most recent location data in connection with a Google account.

x.    *Picasa Web Albums.*   Google provides users with a certain amount of free storage, currently 1 gigabyte, through a service called "Picasa Web Albums" that allow for users to store and share digital photographs.   Google also retains the metadata—or data that provides information about the data in question, such as the time and date of creation, the author or creator, the means of its creation, the purpose of the data, among other data—for photos and videos that are uploaded to Google, including to Picasa Web Albums.   This metadata includes what is known as exchangeable image file format (or "Exif") data, and can include GPS location information for where a photo or video was taken.

xi.    *Android Services.*   Google also maintains information relating to Android, as it relates to an account.   Android is a mobile operating system that is developed by Google, and is used on a variety of touchscreen mobile devices, such as smartphones and tablet computers. Google retains information related to the Android device associated with an account, including the IMEI (the International Mobile Station Equipment Identifier), MEID (the Mobile equipment Identifier), device ID, and/or serial number of the devices.   Each of those identifiers uniquely

4

identifies the device used. One device may be associated with multiple different Google and Android accounts, and one Google or Android account may be associated with multiple devices.

xii.    *Web History.* Google maintains searches and account browsing activity, from Chrome, Google's proprietary web browser, as well as other Google applications.

xiii.    *Google Alerts.* Google provides a service that allows for email notifications any time Google finds new results on a topic of interest to a particular user. Users can create an alert by entering keywords for which they would like to receive email notifications. Once an alert is set up, Google will send emails to the designated email account every time Google finds new search results for the keywords entered by the user.

xiv.    *Google Webmaster Tools and Google Search Console.* Google provides a service (previously called Webmaster Tools but renamed Google Search Console as of May 20, 2015) that allows users to monitor and maintain their site's presence in Google Search results. The tool allows a user to ensure that Google can access the content of a website; submit new content for purposes of crawling (i.e., to ensure that Google captures data from the website for purposes of its search engine) and remove content that the user does not want shown in each result; create and monitor content; see what queries caused a site to appear in search results, and the amount of traffic generated by such searches, and what websites are linked to that site; and other activity.

xv.    *Google Analytics.* Google Analytics is a subscription service offered by Google, which caters to online businesses. A business subscribed to Google Analytics can use the serve to monitor traffic to and within the business's website. Google Analytics collects information about a website's users by installing a "cookie"—or a small piece of data—on the computer of each user of the business's website, which then collects information about the user's interactions with the website by, for example, tracking what pages of the business's website the

5

user visits. Among the user data collected by Google Analytics is "referral traffic," which lets the business see what websites are referring traffic to the business's website—that is, the websites that users are visiting immediately before visiting the subscriber's website. Such data can help the subscriber to understand the sources of its online business. Google Analytics provides a platform through which subscriber can run various queries and generate various reports based on the website traffic data collected through the service. Google Analytics retains records of the queries run and reports generated by the subscriber.

      xvi.    *Google Payments.* Google allows for the storage of payment information associated with a Google Account, including credit cards and bank accounts, and contains information about all transactions made with a Google account, allowing for the payment for goods (such as those purchased through Google Shopping) and bills, among other features.

      xvii.    *Google Apps and Google Apps Administrator Control Panel.* Google Apps is a package of cloud-based services that allow for an organization to communicate in ways beyond emailing and chatting—such as through video conferences, social media, real-time document collaboration, and other things. A user can sign up for Google Apps by providing a domain name that s/he wishes to use with Google services. Google then allows for a group of people to use Gmail, Calendar, Drive, and other services together. The Google Apps Administrator Panel allows a designated user to serve as the administrator of an organization's Google Apps account, allowing the administrator to control access to mail, data, and security for others in the organization. Google Apps Administrator Control Panel lets an administrator monitor how individual services are being used, as well as managing individual domains.

      xviii.    *Google URL Shortener.* Google provides a service that allows a user to shorten URLs to make them easier to share, and tracks the clicks that a shortened URL receives.

xix.   *Preserved and backup records.* The Provider also maintains preserved copies of the foregoing categories of records with respect to an account, for at least 90 days, upon receiving a preservation request from the Government pursuant to 18 U.S.C. § 2703(f).   The Provider may also maintain backup copies of the foregoing categories of records pursuant to its own data retention policy.

### III. Review of Information by the Government

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate any evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Section 1348, and Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Sections 240.10b-5; conspiracy to commit securities fraud, in violation of Title 18, United States Code, Section 371; investment advisor fraud, in violation of Title 15, United States Code, Sections 80b-6 and 80b-17; and conspiracy to commit investment adviser fraud, in violation of Title 18, United States Code, Section 371, among other statutes, including the following:



7

- o all emails with or pertaining to ███████████████████████████
  ████████████████████████████████

- o all emails with or pertaining to entities involved in the issuance, placement, purchase or sale of the bonds;

- o all emails with or pertaining to entities involved in the receipt and/or use of the bond proceeds;

- evidence of crime (*e.g.*, agreement to engage in unlawful conduct, references to or discussion of unlawful conduct), communications constituting crime (*e.g.*, emails containing fraudulent representations); and identities and locations of co-conspirators or victims (communications with co-conspirators or victims, photos or other attachments, address book information).

- e-mail communications with co-conspirators;

- e-mails that can be helpful to establish user identity;

- email header information which can assist in placing the targets or confederates at a certain time and place;

- geographic location of user, computer, or device (*e.g.*, the content and header information can both indicate that the email was communicated through a particular physical location; metadata from photo attachments can reflect geographic location);

- identities and locations of co-conspirators or victims (communications with co-conspirators, photos or other attachments, address book information);

- location of other evidence (*e.g.*, emails reflecting registration of other online accounts potentially containing relevant evidence);

12.28.2016

- passwords or other information needed to access the user's computer or other online accounts.

12.28.2016

Ex. B

1

H1VZZARCC

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                        16 Cr. 371(RA)

5

     DEVON ARCHER, et al,
6
                                        Conference
7              Defendants.

8    ------------------------------x

9                                       New York, N.Y.
                                        January 31, 2017
10                                      4:45 p.m.

11

     Before:
12
                        HON. RONNIE ABRAMS,
13
                                        District Judge
14
                        APPEARANCES
15
     PREET BHARARA
16        United States Attorney for the
          Southern District of New York
17   REBECCA MERMELSTEIN
     BRIAN BLAIS
18   AIMEE HECTOR
          Assistant United States Attorneys
19
     BOIES, SCHILLER & FLEXNER, LLP
20        Attorneys for Defendant Archer
     MATTHEW LANE SCHWARTZ
21   DANIEL SCHWARTZ
     STEPHEN KYRIACOU
22
     PAULA JACLYN NOTARI
23   ABRAHAM J. HASSEN
          Attorneys for Defendant Cooney
24

25   ALSO PRESENT:  SHANNON BIENIEK, FBI

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

H1VZZARCC

```
 1                  (Case called)

 2              THE COURT:  Good afternoon.  I understand both

 3   defendants have waived appearance here today.

 4              We're here to discuss the motions filed by Mr. Archer

 5   and Mr. Cooney concerning search warrants that were served on

 6   Google.  I received the letters, as well as that of the

 7   government.  Mr. Archer and Mr. Cooney asked for two things,

 8   the warrants themselves and an order directing Google on

 9   holding off on producing the data while counsel decides whether

10   or not to challenge warrants.  The request for the warrants is

11   moot because the government indicated they will provide the

12   warrants to extent that they haven't already.  Let's talk about

13   the second issue, whether I should stay the execution of the

14   warrants pending counsels' review.  Mr. Schwartz, Ms. Notari,

15   who would like to begin.

16              MR. M. SCHWARTZ:  I will begin, if it please the

17   Court.  I want to slightly modify the request in light of what

18   we learned from the government's letter last night.  We still

19   have not seen, on behalf of Mr. Archer, an unredacted copy of

20   the warrant, but we learned from the government's letter that

21   it concerns three accounts, two of which are apparently

22   associated with Mr. Archer, and the service provider for one of

23   those accounts has already produced documents.  I would modify

24   our request as follows:  With respect to the Google account,

25   same request, that an order be issued that Google hold off on
```

3

H1VZZARCC

1   making a production, and with respect to the other the Apptix,

2   account, that the government segregate and not review any of

3   the data that it has received until your Honor orders.

4        I appreciate that the government has indicated that

5   it's going to produce the warrants and the application to us.

6   Of course, I asked for that immediately when we saw the

7   government's letter last night.  We haven't seen it yet.  I'm

8   told it's in the mail, which is fine.  We are still proceeding

9   sort of blind here.  To be clear, even with the information

10  that the government provided in its letter, there are still

11  parts of the warrant on its face that are effectively blacked

12  out to us.  We still haven't seen or received information about

13  the unredacted copy of the warrant.

14        THE COURT:  Ms. Mermelstein, do you intend to produce

15  unredacted versions?

16        MS. MERMELSTEIN:  Yes, your Honor.

17        THE COURT:  Is that what's in the mail?

18        MS. MERMELSTEIN:  Yes.  I'm happy to email a copy to

19  Mr. Schwartz today.  Mr. Schwartz is actually wrong.  There are

20  more than three accounts.  There are two accounts that belong

21  to Mr. Archer that are subject to the warrant.  There is, I

22  believe, I could be getting the math wrong, one that's

23  Mr. Cooney's and other accounts that belong to other

24  individuals.  We didn't reference those in the letter since

25  they don't pertain to this defendant, but just to be clear,

4

H1VZZARCC

1    there are more than three.  We will produce an unredacted copy.

2            THE COURT:  Email them today to both counsel.

3            MS. MERMELSTEIN:  Sure.

4            THE COURT:  Mr. Schwartz.

5            MR. M. SCHWARTZ:  This brings us to our request to

6    have an opportunity to examine that material and decide whether

7    to make a challenge, and also to ensure that there are

8    appropriate protocols in place to protect the attorney-client

9    privilege, which is throughout the materials, at least in the

10   two accounts that are associated with Mr. Archer.

11           Let me speak first about the procedural posture,

12   because the government, in its letter, although it doesn't cite

13   any case law, says this is not an acceptable way to proceed,

14   that it would be unprecedented for a Court to hear a motion to

15   quash a search warrant.  That's simply not the case.  First of

16   all, there's nothing at all in the federal rules that prohibits

17   a motion to quash a search warrant or to suggest that a

18   postexecution suppression motion is the only remedy.  To be

19   sure, that's the way it usually happens, because usually you

20   don't have the opportunity to quash a search warrant.  But

21   courts do entertain where the opportunity is presented motions

22   to quash a search warrant, and you don't have to look any

23   further than a decision from the Second Circuit last week that

24   quashed a search warrant to Microsoft for emails.  In that

25   case, the government themselves had argued that that's the

H1VZZARCC

1    appropriate procedure to be brought to challenge the warrant.

2            THE COURT:  You are asking for something akin to a

3    stay.  You are basically saying, I don't want the government to

4    start to do its job with respect to reviewing the data

5    responsive to the search warrants.  That's really what you are

6    asking for.  Is the issue really the timing of the motion, or

7    is the issue really whether I should direct the government to

8    hold off, to stay:  First, if I should direct Google not to

9    produce the documents.  'Second with regard to Apptix, whether

10   I should say, Don't do your job, hold off; I need to decide

11   this before you look at anything.

12           That's really what we are talking about here, right?

13           MR. M. SCHWARTZ:  I'm not sure I quite understand the

14   description.  I think, as a practical matter, you are exactly

15   right.  There is prejudice that would flow directly to

16   Mr. Archer, and others, because there are other individual

17   entities' attorney-client information that are in those emails

18   that would result from the government's review of that

19   material.  The relief that we are asking for is, first, a

20   period of time in which to decide whether to challenge that

21   warrant, then assuming that we make that decision, for your

22   Honor to hear that on its merits before the government

23   undertakes a review of the information that is responsive to

24   the warrants.

25           THE COURT:  Would I essentially be setting a precedent

H1VZZARCC

1   every case in which a defendant has knowledge of a search

2   warrant that it's appropriate for the Court to tell the

3   government not to review the evidence responsive to that until

4   it can decide on the lawfulness of the warrant?

5          MR. M. SCHWARTZ:  I don't think so.  I don't think so

6   at all.  I don't think it's necessary for your Honor to issue

7   such a broad ruling.  I don't think that's the implication of

8   my argument.  I think in a lot of situations the equities and

9   the prejudices will favor the government going forward with the

10  execution of its warrant.  For example, when you're talking

11  about premises, there are legitimate concerns about the

12  movement of evidence or the destruction of evidence.  Those

13  concerns don't exist here, however, because both by its policy

14  and actually by statute, the service providers make copies of

15  all responsive data as soon as they receive the warrant.  There

16  is nothing that could be done here to prejudice the

17  government's position.  That's not true in other instances.

18         Again, this is not without precedent at all.  The

19  government itself urged this is the proper procedure in the

20  Microsoft case before the Second Circuit.  I could cite to you

21  other cases where Courts have entertained either motions to

22  quash search warrants before the fact or motions to enjoin

23  enforcement of search warrants.  Sometimes in the middle of a

24  search people run to court.  Sometimes it's a different kind of

25  search.  For example, you get a warrant for a blood or saliva

7

H1VZZARCC

1    sample, and that's litigated sometimes before the sample is

2    taken.  If you want cases, I would direct your Honor to in the

3    matter of the search of Solomon, 465 F.3d 114, a Third Circuit

4    case; united States v. Kamma, 394 F.3d 1236, a Ninth Circuit

5    case.  In Re Search Warrants, 810 F.2d 67, a Third Circuit

6    case.  The Southern District of New York urged in the Microsoft

7    case that was decided last week that this is the appropriate

8    procedure.  That's docket number 14-2985 in the Second Circuit.

9    I think that that demonstrates that this is an appropriate

10   procedural posture.

11          The government makes the argument that we have

12   conflated the right to obtain evidence with the right to use

13   evidence.  I think that's exactly wrong.  Whether you are

14   challenging a warrant before the fact or after its execution,

15   depending on the nature of the challenge, it's still

16   essentially a challenge as to whether the government was right

17   to have that evidence in the first place.  Think about, for

18   example, a Franks objection.  In a Franks v. Delaware

19   objection, a defendant says that there is an intentional

20   falsehood or omission in a warrant application, and the

21   procedure that the courts employ is you excise or correct the

22   falsehoods and then see if there's still probable cause.  If

23   there isn't, then you suppress the evidence.  That analysis

24   goes to whether there was probable cause in the first place,

25   had accurate evidence and accurate allegations been presented

H1VZZARCC

1     to the magistrate judge.  The inquiry is whether or not the

2     government was entitled to receive that evidence in the first

3     place.  Yes, it often happens, just as a matter of fact, as a

4     matter of the way investigations unfold, that the government

5     gets the evidence first.  Then you have to challenge it after

6     the fact.  Often, the government feels the need for safety or

7     case reasons to get their warrants under seal, but that wasn't

8     the case here and they, to their credit, acknowledged both

9     before the magistrate and in the letter to this Court that

10    there was no need to get this warrant under seal, because the

11    defendants were already indicted, because they were going to

12    produce the evidence immediately, and they didn't say this, but

13    because there was no risk of spoliation of evidence.  But

14    having chosen to do that, and that was really the only possible

15    choice, you open yourself up to scrutiny of the warrants

16    application.

17            Unless your Honor has questions, that's why it's

18    appropriate to hear this motion now.

19            The second question is what do we do about it.  I

20    think your Honor is right that the relief that we are asking

21    for is an opportunity to review the warrant application, which

22    the government says it will give to us, and the warrant, which

23    the government says it will give to us, and see if there is a

24    basis for challenge.  As we wrote in our letter, the warrant,

25    from what we can see, suggests several bases for challenge, and

H1VZZARCC

1    I can think of others, but there's at least one basis for

2    challenge that is facial, and we don't need to see anything

3    else, and that's the fact that the warrant itself contains

4    absolutely no procedure for the protection of the

5    attorney-client privilege and no prohibitions on the government

6    collecting and reviewing attorney-client privilege information.

7    That makes the warrant application defective on its face.

8          Even the cases cited by the government recognize that

9    there are such procedures.  For example, the Hunter case that

10    they cite, the Vermont case says, "The warrant application

11    included a detailed set of instructions to the searching

12    agents, to AUSAs and to computer analysts, all designed to

13    limit invasion of confidential or privileged or irrelevant

14    material."  Even your Honor's decision in the Liu case, that

15    was an after-the-fact challenge and you talked about ethical

16    walls, but another thing that happened in that case was the

17    government put forward the specific procedures in court that

18    they intended to employ to protect the attorney-client

19    privilege, and the defense never objected to that procedure,

20    and your Honor held that that was a waiver.  We are not

21    waiving.  The other entities whose privilege is implicated are

22    not waiving.

23          There are, in these emails, potentially many, many

24    more privileged communications than there are responsive ones.

25    Just to give your Honor a sense of numbers, and to be clear,

H1VZZARCC

1    Mr. Archer has already produced hundreds of emails from these

2    email accounts in response to the government's subpoenas and

3    the SEC subpoenas.  But with respect to the Gmail account, we

4    produced hundreds of emails.  There are at least 2,600 emails

5    that potentially implicate the attorney-client privilege

6    because they have a lawyer somewhere on the chain.  The other

7    account, the Apptix account, again, we produced hundreds of

8    emails.  There are more than 6,300 emails that have potentially

9    attorney-client privilege information.

10          THE COURT:  The government says that having been

11   apprised the defendant's email contains privileged emails, the

12   government will, as it routinely does, use a wall AUSA or taint

13   team to review the defendant's emails for privilege, and if the

14   defendant would like to provide a list of attorneys with whom

15   he communicated, the government will specifically segregate

16   such communications for privilege review.

17          MR. M. SCHWARTZ:  For privilege review from the wall

18   AUSA.  If the wall AUSA determines that the documents are not

19   privileged, they will just turn it over to the investigation

20   team, and if the wall AUSA determines that it might be

21   privileged, I don't understand what the government's proposal

22   is.

23          One of the problems here is that we have no protocol

24   in place.  For the reasons we put in our letter, even a wall

25   AUSA is not really an acceptable protocol.  I would point your

H1VZZARCC

1    Honor's attention in this regard to a Sixth Circuit decision.

2    454 F.3d 511.  In that decision, the Court of Appeals

3    overturned a decision by the district court allowing a taint

4    team, and ordered instead that the proper procedure was that

5    first a special master should segregate potentially privileged

6    emails because they included someone from a list that the

7    defense had provided.  Then the defense was allowed to review

8    the documents for privilege, provide a privilege log to the

9    government, then as in the ordinary course if there were

10   disputes about whether something was properly withheld, then it

11   was elevated to the court.  That's the right way to do this.

12           The privilege belongs to Mr. Archer.  The privilege

13   belongs to the entities and other individuals that are involved

14   in those communications.  The privilege doesn't belong to the

15   government.  All of the cases say that, yes, sometimes a wall

16   AUSA can be appropriate when it's protective of the privilege,

17   when, for example, it's a covert investigation and they do that

18   in order to ensure that there's not leakage.  In a situation

19   like this, where we have the opportunity to ensure that a

20   proper procedure is in place, and that the holder of the

21   privilege can make the privilege determinations, that's the

22   right way to do it.  And very significantly, the government, I

23   think, would want to do it this way because they are asking for

24   a lot of problems if they don't.  If we use a wall AUSA in this

25   case, anything that happens after that is opened up to question

H1VZZARCC

1   whether it's tainted by information that crossed that ethical

2   wall.

3           The government in the Sixth Circuit case conceded that

4   that raises Kastigar-like problems that created the need for

5   evidentiary hearings.  Your Honor, I assume, knows fairly well

6   that's a compelled-testimony case.  It's the same way here.

7   They are not entitled to privileged communications.  If that

8   information crosses the wall, not through malice but through

9   inadvertence or for any other reason, you run the risk that it

10   informs everything else they do.  It informs the questions,

11   their trial strategy, their investigative steps.  Then that

12   creates a problem of whether everything ought to be suppressed.

13           To be clear, the government cites cases saying the use

14   of a wall AUSA has never led to wholesale suppression of

15   evidence.  That's admittedly true in this district.  It's not

16   true throughout the country.  I can cite cases.  The principle,

17   which the Supreme Court has endorsed, is that sufficient

18   invasion of the attorney-client privilege by the government can

19   lead not only to suppression of evidence but dismissal of the

20   indictment outright.  That's the Morrison case, 449 U.S. 361.

21           It seems to me that we have an opportunity here.  It's

22   not as if we have a trial date that's coming up soon.  We have

23   an application that the government has made for a warrant.

24   They have obtained a warrant.  We can put in place a procedure

25   for the defense to make a challenge, if one is warranted, and

13

H1VZZARCC

1    for the parties to either agree upon or for your Honor to

2    decide upon a protocol to ensure that the attorney-client

3    privilege is protected.  That's going to save us all from a lot

4    of litigation and appellate issues down the road.  Or the

5    government can just go forward.  First of all, they are on

6    notice now of these issues, so we shouldn't have to entertain a

7    good-faith defense later on.  They are going to open themselves

8    up to these taint sort of issues.  It seems to me there's a

9    simple solution that, again, I think the government would

10    embrace here, but I take it that they haven't.

11          THE COURT:  Do you want to add anything, Ms. Notari?

12          MS. NOTARI:  I filed my motion late.  I would join in.

13     They didn't have the benefit of my filing when they filed.

14    I'm not sure if there was any production regarding Mr. Cooney.

15          Was there any?

16          MS. MERMELSTEIN:  I don't believe that Mr. Cooney had

17    an Apptix account, so I don't think the government has

18    possession at this point of any emails for Mr. Cooney's

19    account.

20          THE COURT:  Do you have any better sense of timing of

21    the Google production?

22          MS. MERMELSTEIN:  Disconcertingly, it appears -- and

23    I'm not certain of this; Mr. Schwartz may be better situated to

24    answer it -- that the mere fact that he filed something in the

25    court has caused Google to not comply with the lawful order to

14

H1VZZARCC

1    produce the Gmail accounts.  That seems shocking to me,

2    frankly, but it appears to be the case.  Assuming, as I think

3    there can really be no question as to appropriate action here,

4    that this motion is denied, I think your Honor may have to

5    issue a second order to Google saying, I denied it and now it

6    needs to be produced.  The 30 days expired over the weekend,

7    but I think they are standing down.

8             THE COURT:  I didn't mean to interrupt you, Ms.

9    Notari.  Did you have anything else you would like to say?

10            MS. NOTARI:  No.  I would just join in.

11            THE COURT:  Would you like to respond?

12            MS. MERMELSTEIN:  Yes.  Thank you, your Honor.

13            I think this is borderline frivolous.  First of all,

14   let me just say I don't think the Microsoft opinion, which I

15   have not read -- it wasn't cited in Mr. Schwartz's brief -- is

16   at all on point here.  That's a case in which the service

17   provider moved to quash the search warrant.  They obviously

18   either have to comply or move to quash it.  That's not the same

19   as here where it's the user of the account who doesn't want the

20   government to see his emails, so I don't think it's analogous.

21   This is an incredibly routine investigative situation, and I

22   think your Honor is right that there's no cause to stop the

23   government from doing its job.  The notion that where an

24   investigation is not at a covert stage the government won't

25   have access to information until a motion to suppress has been

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

H1VZZARCC

1    decided would be a shocking departure from, I think, both the

2    law and the practice in this district and would create a

3    terrible slippery slope of defendants saying if you are getting

4    a search warrant, I want an opportunity to be heard before it's

5    executed.  It would delay significantly the government's

6    ability to investigate these cases.  I don't think there's any

7    basis for it whatsoever.

8            THE COURT:  What's the prejudice here?  It's true,

9    over your objection, I have not yet scheduled a trial date,

10   although I will do that when we meet approximately a month from

11   now.  What's the prejudice here?

12           MS. MERMELSTEIN:  I think it's two-fold.  Maybe

13   three-fold.  One, although there's no trial date, there is

14   going to be one.  The government may want to take additional

15   investigate steps once it has reviewed these emails.  If these

16   emails cannot be reviewed by the government for some period of

17   time, that means the government can't start the process of

18   reviewing them and producing them to other defendants.  Then we

19   will be in a situation where other defendants will say they

20   don't have enough time.  I think there's prejudice to the

21   government in delaying its investigation in any case but all

22   the more so in a case that has been charged.

23           I separately think that whether or not in this

24   particular case it would be a crisis for the government, it

25   would set a very terrible precedent in this district.  I'm not

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

H1VZZARCC

1   aware of a single case in which it's been done.  That would

2   obstruct the government's investigation in every case where

3   defendants are then moving to suppress before ever even seeing

4   anything.  There are obviously also going to be cases where it

5   turns out there's nothing to suppress -- the email account is

6   empty, the email account has nothing that's relevant to the

7   case -- and you are litigating a huge issue before it's even

8   necessary.  It's really sort of premature to fight about

9   whether or not something is admissible at trial when no one has

10  even said they want to admit it at trial.  I think it would be

11  a very, very troubling outcome to suggest that the government

12  needs to stand down and can't enforce its lawful warrant in

13  this case, or in any case.  I don't think there is a single

14  case where that has been done in a case like this.

15          To the extent that there are privileged

16  communications, we take Mr. Schwartz obviously at his word that

17  there are, and we are happy to run whatever lawyers' names

18  defense proffers through and segregate those things.

19  Ultimately, the risk is on the government.  If it turns out

20  that that gives rise to a suppression motion because Mr.

21  Schwartz doesn't like the way it's been done, then he can bring

22  that motion, but we are not willing to agree to that procedure.

23  We don't think it's appropriate, and if that risk is on the

24  government, then that risk is on the government.

25          THE COURT:  Would you be willing to meet with defense

17

H1VZZARCC

1   counsel, as was suggested, and try to agree upon a protocol for

2   reviewing the documents?

3           MS. MERMELSTEIN:  We're, of course, happy to discuss a

4   protocol with defense counsel.  That can't draw out the process

5   unnecessarily, so we need to have that discussion immediately.

6   Yes, of course, we're happy to discuss what search terms we

7   want and whether or not there are additional search terms that

8   need to be added, etc.

9           THE COURT:  Do you want to discuss the issue with

10  respect to protocols for the wall any further?

11          MS. MERMELSTEIN:  I don't, your Honor.  I think this

12  is, candidly, a fairly standard process.  I think there is a

13  reason to treat cases like this differently than some of the

14  cases that get cited.  With regard to Liu, a law firm was

15  searched.  That obviously implicates a different privilege

16  context than an individual who may have communicated with

17  lawyers.  I think we're comfortable with our protocols.  We use

18  them all the time.  I don't think there's more to say.

19          THE COURT:  Let's take a break for a few minutes.  I'm

20  going to take a quick look at the cases cited by Mr. Schwartz.

21  Let's plan to meet back here at a quarter after.

22          (Recess)

23          THE COURT:  I am not going to block the execution of

24  these warrants.  The motion is denied.

25          I will say I don't agree with the government that this

H1VZZARCC

```
 1    is frivolous.  I would describe it rather as novel,.  But that
 2    said nothing unusual about the government reviewing electronic
 3    data pursuant to a search warrant, and there's nothing out of
 4    the ordinary about having to sort through privilege issues in
 5    the course of its review.  The only thing about this situation
 6    that appears to be somewhat unusual, although I expect it will
 7    come up more and more, is that Google gave Mr. Archer and
 8    Mr. Cooney advance notice of the warrants.  I don't mean to
 9    discount the novelty or complexity of some of the
10    constitutional issues that may be raised by warrants involving
11    electronic data.  It's clear from the Second Circuit's recent
12    en banc decision in Ganais that we are only beginning to
13    grapple with some of these issues.  Mr. Archer and Mr. Cooney
14    are essentially asking me to set a precedent for staying the
15    execution of all warrants of this nature, to allow a potential
16    pre-execution motion, a proposition for which they offer no
17    authority in this circuit and which I'm not prepared to adopt
18    today.  The magistrate judge has deemed these warrants to be
19    proper, and Mr. Archer and Mr. Cooney will have ample
20    opportunity to challenge the validity of the warrants and the
21    manner in which the government conducts its search.  As Ms.
22    Mermelstein noted, the risk is on the government.  I am not
23    willing at this time to take the novel step of blocking the
24    execution of these warrants.
25              That is my ruling.  The motions are denied.  If
```

H1VZZARCC

1    there's a need for me sign an order with respect to Google,

2    submit a proposed order to that effect.

3            MS. MERMELSTEIN:  I will, your Honor.  If we can

4    request in the first instance that Mr. Schwartz notify Google

5    that his opposition has been denied or he is withdrawing it,

6    and we will see if that solves the problem.  Otherwise, we will

7    submit something to you tomorrow.

8            THE COURT:  Unless there are any other applications,

9    we are adjourned.

10           MR. M. SCHWARTZ:  There is, your Honor.  I would ask

11   that your Honor stay your order for 14 days so that we can

12   decide whether to take an interlocutory appeal and seek a stay

13   from the Second Circuit.  It's well established under the

14   Supreme Court's decision in Pearlman that a privilege holder

15   can appeal a disclosure order, "Directed at a disinterested

16   third party, because the third party presumably lacks a

17   sufficient stake in the proceeding to risk contempt of future

18   compliance ."

19           MS. MERMELSTEIN:  Your Honor, Mr. Schwartz keeps

20   quoting cases that weren't in his letter.  I don't have that

21   case in front of me.  It does not seem to me to be directly the

22   situation that we have here.  I don't think a stay of 14 days

23   is appropriate.

24           MR. M. SCHWARTZ:  Your Honor, I'm happy to put in a

25   letter within the next 24 hours citing the authority for the

H1VZZARCC

1 interlocutory appeal.  I'm sure there's no prejudice to the

2 government to take an additional day to understand the case

3 law.

4    THE COURT:  Do that.  I will give you until tomorrow

5 at noon to submit a letter.  If the government would like to

6 submit a letter in response, I will give you another day.  Then

7 I will rule promptly upon that with respect to the request for

8 a stay.

9    MR. M. SCHWARTZ:  Thank you.

10    MS. MERMELSTEIN:  I'm sorry, your Honor.  I think

11 given the time it takes to get these things, the government's

12 request would be that Google be directed to provide the

13 materials.  We won't look at them until your Honor has ruled on

14 this.

15    THE COURT:  I will do that.  You are free to go to

16 Google and say that these objections have been denied.  I want

17 it to be clear that you are not to review the material, to the

18 extent Google provides it, prior to either my decision on the

19 request for the stay, and if I grant the request for the stay,

20 the circuit's ruling.

21    MS. MERMELSTEIN:  I think because the opposition is

22 from Mr. Schwartz, he may need to notify Google of that.  If

23 that's not sufficient, we will have to get an order from your

24 Honor.  They won't take our word for it.  I understand the

25 ruling.  Obviously, we won't look at it until the issue is

21

H1VZZARCC

1    resolved.

2            THE COURT:  We always have the transcript here as

3    well.

4            MS. MERMELSTEIN:  Yes, although by the time we get it

5    and send it to Google, I think it will be resolved.

6            THE COURT:  Tell me if you need anything from me in

7    this respect.

8            MR. M. SCHWARTZ:  We would object to an order for

9    Google to provide that information now.  I don't think it

10   would, but one could imagine an argument that the provision of

11   that data to the government could moot any appeal.  I think in

12   an abundance of caution, since there's no prejudice to the

13   government, there's no reason to do that.

14           THE COURT:  Since we are only talking about two days

15   here, if you want to mention that in your letter, you can

16   mention that in your letter.  Whether it would moot the appeal,

17   I wouldn't think so.  I would think that there would be a good

18   argument that the privacy interest is invaded during the review

19   of the material, but that's an offhand response, and I haven't

20   thought the issue through.  I don't want to rule on it one way

21   or the other.  Feel free to address that in the letters.

22           In the meantime, we will hold off with respect to

23   Google.  We will be in a position to get back to Google one way

24   or another within two days.  Thank you.

25           (Adjourned)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Ex. C

**16 MAG 8347**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

In the Matter of Warrants for All Content and
Other Information Associated with the Email
Accounts: btcooney@gmail.com,
darcher@rosemontseneca.com and
smomtazi@rosemontseneca.com Maintained at
Premises Controlled by Google; and
darcher@rosemontcapital.com and
smomtazi@rosemontcapital.com Maintained at
Premises Controlled by Apptix, USAO
Reference No. 2015R01447
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## SEARCH WARRANT

TO:    Google ("Provider")

       Federal Bureau of Investigation ("Investigative Agency")

**1. Warrant.** Upon an affidavit of Special Agent Shannon Bieniek of the FBI, and pursuant

to the provisions of the Stored Communications Act, 18 U.S.C. § 2703(b)(1)(A) and

§ 2703(c)(1)(A), and the relevant provisions of Federal Rule of Criminal Procedure 41, the Court

hereby finds there is probable cause to believe the email accounts btcooney@gmail.com,

darcher@rosemontseneca.com, and smomtazi@rosemontseneca.com maintained at premises

controlled by Google, contains evidence, fruits, and instrumentalities of crime, all as specified in

Attachment A hereto. Accordingly, the Provider is hereby directed to provide to the Investigative

Agency, within 30 days of the date of service of this Warrant and Order, the records specified in

Section II of Attachment A hereto, for subsequent review by law enforcement personnel as

authorized in Section III of Attachment A. The Government is required to serve a copy of this

Warrant and Order on the Provider within 14 days of the date of issuance.

The Warrant and Order may be served via electronic transmission or any other means through which the Provider is capable of accepting service.

Dated: New York, New York

_12/28/16_
Date Issued

_4:20 p._
Time Issued

S/Barbara Moses

UNITED STATES MAGISTRATE JUDGE
Southern District of New York

**Barbara Moses**
**United States Magistrate Judge**
**Southern District of New York**

12.28.2016

2

## Email Search Attachment A

### I. Subject Accounts and Execution of Warrant

This warrant is directed to Google (the "Provider"), headquartered at 1600 Amphitheatre Parkway, Mountain View, CA 94043, and applies to all content and other information within the Provider's possession, custody, or control associated with the email accounts btcooney@gmail.com, darcher@rosemontseneca.com, and smomtazi@rosemontseneca.com (the "Subject Accounts").

A law enforcement officer will serve this warrant by transmitting it via email or another appropriate manner to the Provider. The Provider is directed to produce to the law enforcement officer an electronic copy of the information specified in Section II below. Upon receipt of the production, law enforcement personnel will review the information for items falling within the categories specified in Section III below.

### II. Information to be Produced by the Provider

To the extent within the Provider's possession, custody, or control, the Provider is directed to produce the following information associated with the Subject Accounts from January 1, 2014 to May 11, 2016:

i. *Email contents.* In general, any email (which can include attachments such as documents, images, and videos) sent to or from a subscriber's account, or stored in draft form in the account, is maintained on the Provider's servers unless and until the subscriber deletes the email. If the subscriber does not delete the email, it can remain on the Provider's computers indefinitely. Even if the subscriber deletes the email, it may continue to be available on the Provider's servers for a certain period of time. [3]

---

[3] Emails and attachments stored by a subscriber on a server maintained by the Provider may not necessarily be located on the subscriber's home computer. The subscriber may store emails or

ii. *Google Docs, Sheets, and Slides.* Google provides users with the ability to write, edit, and collaborate on various documents with other Google users through a service called "Google Docs," "Google Sheets," and "Google Slides." Users can use Google Docs, Sheets, and Slides to create online documents that can be stored on or saved to the user's Google Drive.

iii. *Google Drive content.* Google provides users with a certain amount of free "cloud" storage, currently 15 gigabytes, through a service called "Google Drive" (users can purchase a storage plan through Google to store additional content). Users can use their Google Drive to store email, attachments, videos, photographs, documents, and other content "in the cloud," that is online. A user can access content stored on Google Drive by logging into his or her Google account through any computer or other electronic device that is connected to the Internet. Users can also share files stored on Google Drive with others, allowing them to view, comment, and/or edit the files.

iv. *Google Chats and Hangouts content.* Google allows subscribers to engage in "chat" sessions in an instant messaging format with other Google users, the transcripts of which are generally stored in a user's email content. Similarly, Google allows users to engage in enhanced chat sessions, called Hangouts, which permit the sharing of additional content such as videos, sounds, and images. In general, Hangouts content is stored separately from a user's email and chat content.

---

other files on that Provider's servers for which there is insufficient storage space in the subscriber's computer or which the subscriber does not wish to maintain on that computer. Additionally, a Provider may have kept emails or other files pursuant to a preservation letter even though the subscriber has deleted the emails or files. A search of the files in the computer in the subscriber's residence would therefore not necessarily uncover the files that the subscriber has stored on the Provider's servers.

2

USAO-SDNY_012264

v.    *Address book.* The Provider also allows subscribers to maintain the equivalent of an address book, comprising email addresses and other contact information of other email users.

vi.    *Subscriber and billing information.* Google collects and maintains (typically unverified) identifying information about each subscriber, including, for example, name, username, address, telephone number, and other email addresses associated with the account. Specifically, with regard to other email addresses associated with the account, Google maintains records regarding (1) recovery and (2) alternate email accounts, which can be used to sign in to the account and recover a password; (3) fetching and (4) forwarding addresses, which are email accounts from which the primary account receives emails and forwards emails, respectively; (5) domain aliases or (6) separate domains associated with the account, which are means by which accounts with other domain names can be associated with a primary account; (7) other Google accounts that have access to the primary account, which access can be granted by the user of the primary account; and (8) other email accounts that are associated with the primary account. Google also maintains records concerning the date on which the account was created, the Internet protocol ("IP") address of the user at the time of account creation, the current status of the account (*e.g.*, active or closed), the length of service, and the types of services utilized by the subscriber. Additionally, for paying subscribers, Google maintains records of the subscriber's means and source of payment, including any credit card or bank account number.

vii.    *Transactional information.* The Provider also typically retains certain transactional information about the use of each account on its system. This information can include records of login (*i.e.*, session) times and durations and the methods used to connect to the account (such as logging into the account through the Provider's website).

USAO-SDNY_012265

viii.  *Customer correspondence.*  The Provider also typically maintains records of any customer service contacts with or about the subscriber, including any inquiries or complaints concerning the subscriber's account.

ix.  *Location data.*  Google maintains recent location data, collected periodically, from mobile devices that are logged into or have used applications (or "apps") or services provided by Google.  For example, Google collects information collected from GPS, Wi-Fi networks, cell site locations, and mobile networks to estimate a user's location.  Google apps and services also allow for location reporting, which allows Google to periodically store and use a device's most recent location data in connection with a Google account.

x.  *Picasa Web Albums.*  Google provides users with a certain amount of free storage, currently 1 gigabyte, through a service called "Picasa Web Albums" that allow for users to store and share digital photographs.  Google also retains the metadata—or data that provides information about the data in question, such as the time and date of creation, the author or creator, the means of its creation, the purpose of the data, among other data—for photos and videos that are uploaded to Google, including to Picasa Web Albums.  This metadata includes what is known as exchangeable image file format (or "Exif") data, and can include GPS location information for where a photo or video was taken.

xi.  *Android Services.*  Google also maintains information relating to Android, as it relates to an account.  Android is a mobile operating system that is developed by Google, and is used on a variety of touchscreen mobile devices, such as smartphones and tablet computers. Google retains information related to the Android device associated with an account, including the IMEI (the International Mobile Station Equipment Identifier), MEID (the Mobile equipment Identifier), device ID, and/or serial number of the devices.  Each of those identifiers uniquely

4

USAO-SDNY_012266

identifies the device used. One device may be associated with multiple different Google and Android accounts, and one Google or Android account may be associated with multiple devices.

xii. *Web History.* Google maintains searches and account browsing activity, from Chrome, Google's proprietary web browser, as well as other Google applications.

xiii. *Google Alerts.* Google provides a service that allows for email notifications any time Google finds new results on a topic of interest to a particular user. Users can create an alert by entering keywords for which they would like to receive email notifications. Once an alert is set up, Google will send emails to the designated email account every time Google finds new search results for the keywords entered by the user.

xiv. *Google Webmaster Tools and Google Search Console.* Google provides a service (previously called Webmaster Tools but renamed Google Search Console as of May 20, 2015) that allows users to monitor and maintain their site's presence in Google Search results. The tool allows a user to ensure that Google can access the content of a website; submit new content for purposes of crawling (i.e., to ensure that Google captures data from the website for purposes of its search engine) and remove content that the user does not want shown in each result; create and monitor content; see what queries caused a site to appear in search results, and the amount of traffic generated by such searches, and what websites are linked to that site; and other activity.

xv. *Google Analytics.* Google Analytics is a subscription service offered by Google, which caters to online businesses. A business subscribed to Google Analytics can use the serve to monitor traffic to and within the business's website. Google Analytics collects information about a website's users by installing a "cookie"—or a small piece of data—on the computer of each user of the business's website, which then collects information about the user's interactions with the website by, for example, tracking what pages of the business's website the

USAO-SDNY_012267

user visits. Among the user data collected by Google Analytics is "referral traffic," which lets the business see what websites are referring traffic to the business's website—that is, the websites that users are visiting immediately before visiting the subscriber's website. Such data can help the subscriber to understand the sources of its online business. Google Analytics provides a platform through which subscriber can run various queries and generate various reports based on the website traffic data collected through the service. Google Analytics retains records of the queries run and reports generated by the subscriber.

xvi. *Google Payments.* Google allows for the storage of payment information associated with a Google Account, including credit cards and bank accounts, and contains information about all transactions made with a Google account, allowing for the payment for goods (such as those purchased through Google Shopping) and bills, among other features.

xvii. *Google Apps and Google Apps Administrator Control Panel.* Google Apps is a package of cloud-based services that allow for an organization to communicate in ways beyond emailing and chatting—such as through video conferences, social media, real-time document collaboration, and other things. A user can sign up for Google Apps by providing a domain name that s/he wishes to use with Google services. Google then allows for a group of people to use Gmail, Calendar, Drive, and other services together. The Google Apps Administrator Panel allows a designated user to serve as the administrator of an organization's Google Apps account, allowing the administrator to control access to mail, data, and security for others in the organization. Google Apps Administrator Control Panel lets an administrator monitor how individual services are being used, as well as managing individual domains.

xviii. *Google URL Shortener.* Google provides a service that allows a user to shorten URLs to make them easier to share, and tracks the clicks that a shortened URL receives.

6

USAO-SDNY_012268

xix.  *Preserved and backup records*. The Provider also maintains preserved copies of the foregoing categories of records with respect to an account, for at least 90 days, upon receiving a preservation request from the Government pursuant to 18 U.S.C. § 2703(f). The Provider may also maintain backup copies of the foregoing categories of records pursuant to its own data retention policy.

## III. Review of Information by the Government

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate any evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Section 1348, and Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Sections 240.10b-5; conspiracy to commit securities fraud, in violation of Title 18, United States Code, Section 371; investment advisor fraud, in violation of Title 15, United States Code, Sections 80b-6 and 80b-17; and conspiracy to commit investment adviser fraud, in violation of Title 18, United States Code, Section 371, among other statutes, including the following:

- evidence of the agreement to engage in a fraudulent scheme involving the issuance of bonds on behalf of the Wakpamni Lake Community Corporation ("WLCC") and the misappropriation of the proceeds of those bonds, from January 1, 2014 to May 11, 2016;

- evidence of communications and/or meetings involving or related to the bonds issued on behalf of the WLCC, including but not limited to:

USAO-SDNY_012269

- o all emails with or pertaining to Jason Galanis, John Galanis, Gary Hirst, Hugh Dunkerley, Michelle Morton, Devon Archer, and Bevan Cooney;

- o all emails with or pertaining to entities involved in the issuance, placement, purchase or sale of the bonds;

- o all emails with or pertaining to entities involved in the receipt and/or use of the bond proceeds;

- evidence of crime (*e.g.*, agreement to engage in unlawful conduct, references to or discussion of unlawful conduct), communications constituting crime (*e.g.*, emails containing fraudulent representations); and identities and locations of co-conspirators or victims (communications with co-conspirators or victims, photos or other attachments, address book information).

- e-mail communications with co-conspirators;

- e-mails that can be helpful to establish user identity;

- email header information which can assist in placing the targets or confederates at a certain time and place;

- geographic location of user, computer, or device (*e.g.*, the content and header information can both indicate that the email was communicated through a particular physical location; metadata from photo attachments can reflect geographic location);

- identities and locations of co-conspirators or victims (communications with co-conspirators, photos or other attachments, address book information);

- location of other evidence (*e.g.*, emails reflecting registration of other online accounts potentially containing relevant evidence);

12.28.2016

USAO-SDNY_012270

- passwords or other information needed to access the user's computer or other online accounts.

9

USAO-SDNY_012271

Ex. D

# 16 MAG 8347

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In the Matter of Warrants for All Content and
Other Information Associated with the Email
Accounts: btcooney@gmail.com,
darcher@rosemontseneca.com and
smomtazi@rosemontseneca.com Maintained at
Premises Controlled by Google; and
darcher@rosemontcapital.com and
smomtazi@rosemontcapital.com Maintained at
Premises Controlled by Apptix, USAO
Reference No. 2015R01447

## SEARCH WARRANT

TO:     Apptix ("Provider")

        Federal Bureau of Investigation ("Investigative Agency")

**1. Warrant.** Upon an affidavit of Special Agent Shannon Bieniek of the FBI, and pursuant

to the provisions of the Stored Communications Act, 18 U.S.C. § 2703(b)(1)(A) and

§ 2703(c)(1)(A), and the relevant provisions of Federal Rule of Criminal Procedure 41, the Court

hereby finds there is probable cause to believe the email accounts darcher@rosemontcapital.com

and smomtazi@rosemontcapital.com maintained at premises controlled by Apptix, contains

evidence, fruits, and instrumentalities of crime, all as specified in Attachment A hereto.

Accordingly, the Provider is hereby directed to provide to the Investigative Agency, within 30

days of the date of service of this Warrant and Order, the records specified in Section II of

Attachment A hereto, for subsequent review by law enforcement personnel as authorized in

Section III of Attachment A. The Government is required to serve a copy of this Warrant and

Order on the Provider within 14 days of the date of issuance.

10

12.28.2016

The Warrant and Order may be served via electronic transmission or any other means through which the Provider is capable of accepting service.

Dated:  New York, New York

_12/24/16_
Date Issued

_4:20 p_
Time Issued

S/Barbara Moses

UNITED STATES MAGISTRATE JUDGE
Southern District of New York

**Barbara Moses**
**United States Magistrate Judge**
**Southern District of New York**

11

12.28.2016

**Email Search Attachment A**

I.     **Subject Accounts and Execution of Warrant**

This warrant is directed to Apptix (the "Provider"), headquartered at 13461 Sunrise Valley Drive, Ste 300, Herndon, VA 20171, and applies to all content and other information within the Provider's possession, custody, or control associated with the email accounts darcher@rosemontcapital.com and smomtazi@rosemontcapital.com (the "Subject Accounts").

A law enforcement officer will serve this warrant by transmitting it via email or another appropriate manner to the Provider. The Provider is directed to produce to the law enforcement officer an electronic copy of the information specified in Section II below. Upon receipt of the production, law enforcement personnel will review the information for items falling within the categories specified in Section III below.

II.    **Information to be Produced by the Provider**

To the extent within the Provider's possession, custody, or control, the Provider is directed to produce the following information associated with the Subject Accounts from January 1, 2014 to May 11, 2016:

i.     Email contents.  In general, any email (which can include attachments such as documents, images, and videos) sent to or from a subscriber's account, or stored in draft form in the account, is maintained on the Providers' servers unless and until the subscriber deletes the email. If the subscriber does not delete the email, it can remain on the Providers' computers indefinitely. Even if the subscriber deletes the email, it may continue to be available on the Providers' servers for a certain period of time.[4]

---

[4] Emails and attachments stored by a subscriber on a server maintained by the Provider may not necessarily be located on the subscriber's home computer. The subscriber may store emails or other files on that Provider's servers for which there is insufficient storage space in the subscriber's computer or which the subscriber does not wish to maintain on that computer. Additionally, a

ii.    Address book. The Providers also allow subscribers to maintain the equivalent of an address book, comprising email addresses and other contact information of other email users.

iii.    Subscriber and billing information. The Providers collect and maintain (typically unverified) identifying information about each subscriber, including, for example, name, username, address, telephone number, and alternate email addresses. The Providers also maintain records concerning the date on which the account was created, the Internet protocol ("IP") address of the user at the time of account creation, the current status of the account (e.g., active or closed), the length of service, and the types of services utilized by the subscriber. Additionally, for paying subscribers, the Providers maintain records of the subscriber's means and source of payment, including any credit card or bank account number.

iv.    Transactional information. The Providers also typically retain certain transactional information about the use of each account on its system. This information can include records of login (i.e., session) times and durations and the methods used to connect to the account (such as logging into the account through the Providers' websites).

v.    Customer correspondence. The Providers also typically maintain records of any customer service contacts with or about the subscriber, including any inquiries or complaints concerning the subscriber's account.

vi.    Preserved records. The Providers also maintain preserved copies of the foregoing categories of records with respect to an account, typically for at least 90 days, upon receiving a preservation request from the Government pursuant to 18 U.S.C. § 2703(f).

---

Provider may have kept emails or other files pursuant to a preservation letter even though the subscriber has deleted the emails or files. A search of the files in the computer in the subscriber's residence would therefore not necessarily uncover the files that the subscriber has stored on the Provider's servers.

12.28.2016

USAO-SDNY_012275

**III. Review of Information by the Government**

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate any evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Section 1348, and Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Sections 240.10b-5; conspiracy to commit securities fraud, in violation of Title 18, United States Code, Section 371; investment advisor fraud, in violation of Title 15, United States Code, Sections 80b-6 and 80b-17; and conspiracy to commit investment adviser fraud, in violation of Title 18, United States Code, Section 371, among other statutes, including the following:

- evidence of the agreement to engage in a fraudulent scheme involving the issuance of bonds on behalf of the Wakpamni Lake Community Corporation ("WLCC") and the misappropriation of the proceeds of those bonds, from January 1, 2014 to May 11, 2016;
- evidence of communications and/or meetings involving or related to the bonds issued on behalf of the WLCC, including but not limited to:
  - o all emails with or pertaining to Jason Galanis, John Galanis, Gary Hirst, Hugh Dunkerley, Michelle Morton, Devon Archer, and Bevan Cooney;
  - o all emails with or pertaining to entities involved in the issuance, placement, purchase or sale of the bonds;
  - o all emails with or pertaining to entities involved in the receipt and/or use of the bond proceeds;

3

USAO-SDNY_012276

- evidence of crime (*e.g.*, agreement to engage in unlawful conduct, references to or discussion of unlawful conduct), communications constituting crime (*e.g.*, emails containing fraudulent representations); and identities and locations of co-conspirators or victims (communications with co-conspirators or victims, photos or other attachments, address book information).

- e-mail communications with co-conspirators;

- e-mails that can be helpful to establish user identity;

- email header information which can assist in placing the targets or confederates at a certain time and place;

- geographic location of user, computer, or device (*e.g.*, the content and header information can both indicate that the email was communicated through a particular physical location; metadata from photo attachments can reflect geographic location);

- identities and locations of co-conspirators or victims (communications with co-conspirators, photos or other attachments, address book information);

- location of other evidence (*e.g.*, emails reflecting registration of other online accounts potentially containing relevant evidence);

- passwords or other information needed to access the user's computer or other online accounts.

USAO-SDNY_012277

Ex. E

16 MAG 8347

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------

In the Matter of Warrants for All Content
and Other Information Associated with the
Email Accounts: btcooney@gmail.com,
darcher@rosemontseneca.com and
smomtazi@rosemontseneca.com
Maintained at Premises Controlled by
Google; and darcher@rosemontcapital.com
and smomtazi@rosemontcapital.com
Maintained at Premises Controlled by
Apptix, USAO Reference No. 2015R01447
--------------------------------------------------------

**TO BE FILED UNDER SEAL**

**AGENT AFFIDAVIT**

**Agent Affidavit in Support of Application for Search Warrants
for Stored Electronic Communications**

STATE OF NEW YORK )
                 ) ss.
COUNTY OF NEW YORK )

        SHANNON BIENIEK, Special Agent with the Federal Bureau of Investigation ("FBI"),

being duly sworn, deposes and states:

**I.    Introduction**

    **A. Affiant**

        1.  I have been a Special Agent with the FBI for approximately five years.  I am currently

assigned to a squad that investigates white collar crimes, including securities fraud.  I have received

training regarding computer technology and have participated in the execution of search warrants

involving electronic documents.

    **B. The Providers, the Subject Accounts, and the Subject Offenses**

        2.  I make this affidavit in support of an application for search warrants pursuant to 18

U.S.C. § 2703 for all content, including emails and draft emails, created, sent or received between

January 1, 2014 and May 11, 2016, inclusive, and other information associated with the email

1

USAO-SDNY_012217

accounts: btcooney gmail.com (the "COONEY ACCOUNT"), darcher@rosemontseneca.com (the "ARCHER SENECA ACCOUNT") and smomtazi@rosemontseneca.com (the "MOMTAZI SENECA ACCOUNT") maintained and controlled by Google, headquartered at 1600 Amphitheatre Parkway, Mountain View, CA 94043; and darcher@rosemontcapital.com (the "ARCHER ACCOUNT") and smomtazi@rosemontcapital.com (the "MOMTAZI ACCOUNT"), maintained and controlled by Apptix (together, the "Providers"), headquartered at 13461 Sunrise Valley Drive, Ste 300, Herndon, VA 20171 (together the "Subject Accounts"). The information to be searched is described in the following paragraphs and in Attachment A to the proposed warrants.

3.  As detailed below, there is probable cause to believe that the Subject Accounts contain evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Section 1348, and Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Sections 240.10b-5; conspiracy to commit securities fraud, in violation of Title 18, United States Code, Section 371; investment advisor fraud, in violation of Title 15, United States Code, Sections 80b-6 and 80b-17; and conspiracy to commit investment adviser fraud, in violation of Title 18, United States Code, Section 371 (the "Subject Offenses").  This affidavit is based upon my personal knowledge, my review of documents and other evidence, and my conversations with other law enforcement officers, as well as my training and experience concerning the use of email in criminal activity. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts I have learned during my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

### C. Services and Records of the Providers

4.  I have learned the following about the Providers:

2

12.28.2016

a. The Providers offer email services to the public. In particular, the Providers allow subscribers to maintain email accounts which can be accessed from any computer connected to the Internet.

b. The Providers maintain certain of the following records and information with respect to subscriber accounts:[1]

i. *Email contents*. In general, any email (which can include attachments such as documents, images, and videos) sent to or from a subscriber's account, or stored in draft form in the account, is maintained on the Providers' servers unless and until the subscriber deletes the email. If the subscriber does not delete the email, it can remain on the Providers' computers indefinitely. Even if the subscriber deletes the email, it may continue to be available on the Providers' servers for a certain period of time.

ii. *Google Docs, Sheets, and Slides*. Google provides users with the ability to write, edit, and collaborate on various documents with other Google users through a service called "Google Docs," "Google Sheets," and "Google Slides." Users can use Google Docs, Sheets, and Slides to create online documents that can be stored on or saved to the user's Google Drive.

iii. *Google Drive content*. Google provides users with a certain amount of free "cloud" storage, currently 15 gigabytes, through a service called "Google Drive" (users can purchase a storage plan through Google to store additional content). Users can use their Google Drive to store email, attachments, videos, photographs, documents, and other content "in the cloud," that is online. A user can access content stored on Google Drive by logging into his or her Google account through any computer or other electronic device that is connected to the

---

[1] Certain of the listed records and information are only applicable to Google, as indicated.

USAO-SDNY_012219

Internet. Users can also share files stored on Google Drive with others, allowing them to view, comment, and/or edit the files.

iv. *Google Chats and Hangouts content.* Google allows subscribers to engage in "chat" sessions in an instant messaging format with other Google users, the transcripts of which are generally stored in a user's email content. Similarly, Google allows users to engage in enhanced chat sessions, called Hangouts, which permit the sharing of additional content such as videos, sounds, and images. In general, Hangouts content is stored separately from a user's email and chat content.

v. *Address book.* The Providers also allow subscribers to maintain the equivalent of an address book, comprising email addresses and other contact information of other email users.

vi. *Subscriber and billing information.* The Providers collect and maintain (typically unverified) identifying information about each subscriber, including, for example, name, username, address, telephone number, and other email addresses associated with the account. Specifically, with regard to other email addresses associated with the account, Google maintains records regarding (1) recovery and (2) alternate email accounts, which can be used to sign in to the account and recover a password; (3) fetching and (4) forwarding addresses, which are email accounts from which the primary account receives emails and forwards emails, respectively; (5) domain aliases or (6) separate domains associated with the account, which are means by which accounts with other domain names can be associated with a primary account; (7) other Google accounts that have access to the primary account, which access can be granted by the user of the primary account; and (8) other email accounts that are associated with the primary account. Google also maintains records concerning the date on which the account was created, the Internet

12.28.2016

USAO-SDNY_012220

protocol ("IP") address of the user at the time of account creation, the current status of the account (*e.g.*, active or closed), the length of service, and the types of services utilized by the subscriber. Additionally, for paying subscribers, Google maintains records of the subscriber's means and source of payment, including any credit card or bank account number.

vii. *Transactional information.* The Providers also typically retain certain transactional information about the use of each account on its system. This information can include records of login (*i.e.*, session) times and durations and the methods used to connect to the account (such as logging into the account through the Providers' website).

viii. *Customer correspondence.* The Providers also typically maintain records of any customer service contacts with or about the subscriber, including any inquiries or complaints concerning the subscriber's account.

ix. *Location data.* Google maintains recent location data, collected periodically, from mobile devices that are logged into or have used applications (or "apps") or services provided by Google. For example, Google collects information collected from GPS, Wi-Fi networks, cell site locations, and mobile networks to estimate a user's location. Google apps and services also allow for location reporting, which allows Google to periodically store and use a device's most recent location data in connection with a Google account.

x. *Picasa Web Albums.* Google provides users with a certain amount of free storage, currently 1 gigabyte, through a service called "Picasa Web Albums" that allow for users to store and share digital photographs. Google also retains the metadata—or data that provides information about the data in question, such as the time and date of creation, the author or creator, the means of its creation, the purpose of the data, among other data—for photos and videos that are uploaded to Google, including to Picasa Web Albums. This metadata includes what is known

USAO-SDNY_012221

as exchangeable image file format (or "Exif") data, and can include GPS location information for where a photo or video was taken.

xi.    *Android Services.*  Google also maintains information relating to Android, as it relates to an account.  Android is a mobile operating system that is developed by Google, and is used on a variety of touchscreen mobile devices, such as smartphones and tablet computers. Google retains information related to the Android device associated with an account, including the IMEI (the International Mobile Station Equipment Identifier), MEID (the Mobile equipment Identifier), device ID, and/or serial number of the devices.  Each of those identifiers uniquely identifies the device used.  One device may be associated with multiple different Google and Android accounts, and one Google or Android account may be associated with multiple devices.

xii.    *Web History.*  Google maintains searches and account browsing activity, from Chrome, Google's proprietary web browser, as well as other Google applications.

xiii.    *Google Alerts.*  Google provides a service that allows for email notifications any time Google finds new results on a topic of interest to a particular user.  Users can create an alert by entering keywords for which they would like to receive email notifications.  Once an alert is set up, Google will send emails to the designated email account every time Google finds new search results for the keywords entered by the user.

xiv.    *Google Webmaster Tools and Google Search Console.*  Google provides a service (previously called Webmaster Tools but renamed Google Search Console as of May 20, 2015) that allows users to monitor and maintain their site's presence in Google Search results.  The tool allows a user to ensure that Google can access the content of a website; submit new content for purposes of crawling (i.e., to ensure that Google captures data from the website for purposes of its search engine) and remove content that the user does not want shown in each result; create

6

USAO-SDNY_012222

and monitor content; see what queries caused a site to appear in search results, and the amount of traffic generated by such searches, and what websites are linked to that site; and other activity.

xv. *Google Analytics.* Google Analytics is a subscription service offered by Google, which caters to online businesses. A business subscribed to Google Analytics can use the serve to monitor traffic to and within the business's website. Google Analytics collects information about a website's users by installing a "cookie"—or a small piece of data—on the computer of each user of the business's website, which then collects information about the user's interactions with the website by, for example, tracking what pages of the business's website the user visits. Among the user data collected by Google Analytics is "referral traffic," which lets the business see what websites are referring traffic to the business's website—that is, the websites that users are visiting immediately before visiting the subscriber's website. Such data can help the subscriber to understand the sources of its online business. Google Analytics provides a platform through which subscriber can run various queries and generate various reports based on the website traffic data collected through the service. Google Analytics retains records of the queries run and reports generated by the subscriber.

xvi. *Google Payments.* Google allows for the storage of payment information associated with a Google Account, including credit cards and bank accounts, and contains information about all transactions made with a Google account, allowing for the payment for goods (such as those purchased through Google Shopping) and bills, among other features.

xvii. *Google Apps and Google Apps Administrator Control Panel.* Google Apps is a package of cloud-based services that allow for an organization to communicate in ways beyond emailing and chatting—such as through video conferences, social media, real-time document collaboration, and other things. A user can sign up for Google Apps by providing a domain name

12.28.2016

USAO-SDNY_012223

that s/he wishes to use with Google services. Google then allows for a group of people to use Gmail, Calendar, Drive, and other services together. The Google Apps Administrator Panel allows a designated user to serve as the administrator of an organization's Google Apps account, allowing the administrator to control access to mail, data, and security for others in the organization. Google Apps Administrator Control Panel lets an administrator monitor how individual services are being used, as well as managing individual domains.

    xviii. *Google URL Shortener*. Google provides a service that allows a user to shorten URLs to make them easier to share, and tracks the clicks that a shortened URL receives.

    xix. *Preserved and backup records*. The Providers also maintain preserved copies of the foregoing categories of records with respect to an account, for at least 90 days, upon receiving a preservation request from the Government pursuant to 18 U.S.C. § 2703(f). The Providers may also maintain backup copies of the foregoing categories of records pursuant to its own data retention policy.

### D. Jurisdiction and Authority to Issue Warrant

  5. Pursuant to 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A), the Government may require a provider of an electronic communications service or a remote computing service, such as the Providers, to disclose all stored content and all non-content records or other information pertaining to a subscriber, by obtaining a warrant issued using the procedures described in the Federal Rules of Criminal Procedure.

  6. A search warrant under § 2703 may be issued by "any district court of the United States (including a magistrate judge of such a court)" that "has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

  7. When the Government obtains records under § 2703 pursuant to a search warrant, the Government is not required to notify the subscriber of the existence of the warrant. 18 U.S.C.

12.28.2016

USAO-SDNY_012224

§ 2703(a), (b)(1)(A), (c)(2) & (3). Additionally, the Government may obtain an order precluding the Provider from notifying the subscriber or any other person of the warrant, for such period as the Court deems appropriate, where there is reason to believe that such notification will seriously jeopardize an investigation. 18 U.S.C. § 2705(b).

## II.    Probable Cause

### A. Probable Cause Regarding the Subject Offenses

8.  As part of my investigation in this case, I have reviewed, among other things, business records, bank records, telephone records, public records, email correspondence, court filings, and spoken to SEC staff attorneys about their review of such records. Based on my review of those documents and materials, and my participation in those conversations and interviews, I have concluded that there is probable cause to believe that Devon Archer and Bevan Cooney have engaged in the Subject Offenses. This affidavit does not contain all of the information that I have learned in connection with this investigation, but is limited to only those facts necessary to support probable cause to search the Subject Accounts.

### The Investigation and Prosecution

9.  Since at least 2015, the FBI and the United States Postal Inspection Service ("USPIS") have been investigating individuals involved in a fraudulent scheme to (i) to misappropriate the proceeds of bonds (the "Tribal Bonds") issued by the Wakpamni Lake Community Corporation (the "WLCC"), a subordinate unit of the Oglala Sioux Native American Tribe; and (ii) to use funds in the accounts of clients of captive asset management firms to purchase the Tribal Bonds, which the clients were then unable to redeem or sell because of the illiquidity of the Tribal Bonds and the lack of a ready secondary market for the same.

10. On or about November 2, 2016, a Grand Jury sitting in the Southern District of New York returned a Superseding Indictment, S1 16 Cr. 371 (RA) (the "Indictment"), charging Jason

12.28.2016

USAO-SDNY_012225

Galanis, Gary Hirst ("Hirst"), John Galanis ("Galanis"), Hugh Dunkerley ("Dunkerley"), Michelle

Morton ("Morton"), Devon Archer ("Archer") and Bevan Cooney ("Cooney") (together "the

Defendants") with conspiracy to commit securities fraud (Count One) and securities fraud (Count

Two). Jason Galanis, Hirst, and Morton were also charged with conspiracy to commit investment

advisor fraud (Count Three) and investment advisor fraud (Count Four). The Defendants had all

previously been arrested on May 11, 2016 pursuant to a criminal complaint.

    11. The Indictment is attached hereto as Exhibit A, and the facts contained therein are

incorporated by reference herein. Nonetheless, the following provides a summary of the charged

fraudulent scheme, based on my knowledge and participation in this investigation:

        a. Beginning in or about March 2014, John Galanis and Jason Galanis pitched the

           concept of special limited taxable revenue bonds (the "Tribal Bonds") to employees

           and advisors to the WLCC. The WLCC ultimately agreed to a series of four bond

           issuances, totaling approximately $60 million. (Ex. A ¶ 6).

        b. According to trust indentures and other documents underlying the bond issuances,

           the WLCC understood that the proceeds of the bond issuances were going to be

           provided to an annuity provider to be invested for the benefit of the WLCC, which

           would generate enough income to pay interest to the bondholders and an annual

           sum to the WLCC for use in development projects. (Ex. A ¶ 7). Instead, significant

           portions of the bond proceeds were misappropriated and diverted for the personal

           benefit and use of the Defendants. (Ex. A ¶ 17).

        c. In order for the scheme to succeed, Jason Galanis and his co-conspirators needed

           to generate buyers for the Tribal Bonds, which was particularly challenging given

           that there was no ready secondary market. To that end, Jason Galanis gained

USAO-SDNY_012226

control of two related investment advisers, Hughes Capital Management, Inc. ("Hughes") and Atlantic Asset Management, LLC ("Atlantic") (together "the Investment Advisers"), with financing provided, at least in part, by an entity controlled by Jason Galanis, Archer, Cooney and Dunkerley.

d. Morton and Hirst, acting at the direction of Jason Galanis, used funds belonging to clients of the Investment Advisers to purchase the Tribal Bonds, even though Jason Galanis, Hirst and Morton were well aware that material facts about the Tribal Bonds had been withheld from clients in whose accounts they were placed, including the fact that the Tribal Bond purchases fell outside of the investment parameters set forth in the investment advisory contracts of certain of those clients. When the Investment Adviser clients learned about the purchase of the Tribal Bonds in their accounts, several of them demanded that the Tribal Bonds be sold. However, because there was no ready secondary market, the Tribal Bonds could not be sold.

e. In addition, a portion of the misappropriated proceeds were recycled and provided by Jason Galanis to entities affiliated with Archer and Cooney in order to enable Archer and Cooney to purchase subsequent Tribal Bonds issued by the WLCC. As a result of the use of recycled proceeds to purchase additional issuances of Tribal Bonds, the face amount of Tribal Bonds outstanding increased and the amount of interest payable by the WLCC increased, but the actual bond proceeds available for investment on behalf of the WLCC did not increase.

12.28.2016

11

**B. Probable Cause Regarding the Subject Accounts**

12. Based on my participation in this investigation, I believe there is probable cause to search the Subject Accounts for all content, including emails and drafts, and other information associated with the Subject Accounts from January 1, 2014 to May 11, 2016.

13. In particular, as part of this investigation, I have reviewed email correspondence involving Jason Galanis, Cooney at the COONEY ACCOUNT, Archer at the ARCHER ACCOUNT and/or the ARCHER SENECA ACCOUNT and Momtazi,[2] at the MOMTAZI ACCOUNT and/or the MOMTAZI SENECA ACCOUNT concerning, inter alia, the initiation of the scheme to orchestrate the issuance of the Tribal Bonds; the placement of the Tribal Bonds with clients of the captive Investment Advisors; and the use of Tribal Bond proceeds. Some examples of such emails are described herein, in substance and in part. For example:

14. Soon after John Galanis first pitched the concept of the Tribal Bonds to the WLCC, Jason Galanis engaged in email correspondence with Archer at the ARCHER ACCOUNT and Cooney at the COONEY ACCOUNT to apprise them of the progress of the bond issuance. These emails further demonstrate that Jason Galanis and his co-conspirators intended to fraudulently control and use the proceeds of the bond issuances for their own purposes. Specifically:

   a. On or about April 4, 2014, Jason Galanis sent an email to the ARCHER ACCOUNT and the COONEY ACCOUNT with subject line "Oglala Native Spirits Memo.docx." The body of the email stated, "$20mm bond approved. Proceeds are

---

[2] At times relevant to the events described in the Indictment, Sebastian Momtazi served as Chief Operating Officer of Rosemont Capital, LLC and Rosemont Seneca Partners. Archer is a co-founder of Rosemont Capital LLC, an investment platform that manages private equity, fixed income and real estate investments, and Rosemont Seneca Partners, a private equity firm specializing in technology companies.

12.28.2016

USAO-SDNY_012228

$15mm *to us* and 5mm to them for a winery investment they want to make." (emphasis added).

b. On or about July 5, 2014, Jason Galanis sent an email to the ARCHER ACCOUNT and the COONEY ACCOUNT in which Jason Galanis apprised Cooney and Archer that, in sum and substance and in part, counsel for the WLCC had "met and approved the [bond issuance]." Jason Galanis further stated, "[S]hooting for end of month. lots to accomplish to finesse this over the line. im [sic] not counting the money yet, but I'm encouraged by the quality fo [sic] the work and the professionalism from everyone im [sic] coordinating." Jason Galanis further wrote, "[M]y primary objective is *to get us a source of discretionary liquidity*. sick of begging." (emphasis added).

c. On or about August 15, 2014, Jason Galanis sent an email to the ARCHER ACCOUNT and the COONEY ACCOUNT indicating that representatives of the WLCC had executed the legal documentation necessary for the first Tribal Bond issuance to occur. Cooney responded from the COONEY ACCOUNT, "This is pure genius alla [sic] mikey Milken!! The Native American Bonds!!...Great work here Greek!!" Based on my review of documents, I know that "Greek" is a nickname sometimes used by Jason Galanis, Archer and Cooney to refer to Jason Galanis. Also, based on my training and experience, and involvement in this investigation, I believe the statement "alla mikey Milken" refers to Michael Milken, who is a former financier notorious for his involvement in the development of the "junk bond" market and his conviction on securities fraud charges.

13

USAO-SDNY_012229

15. In furtherance of the scheme, as described above, Jason Galanis obtained control over the Investment Advisers in order to use client funds for his own purposes, such as the purchase of the Tribal Bonds. Jason Galanis did so by arranging for an entity he, Archer, Cooney and Dunkerley, among others, controlled, to provide financing for Morton to purchase the investment advisors. Jason Galanis kept Archer and Cooney apprised, via email communication, of his efforts to gain control of an investment advisor for purposes of selling the Tribal Bonds. For example:

    a. On or about May 9, 2014, Jason Galanis sent an email to the ARCHER ACCOUNT and the COONEY ACCOUNT, among others. The subject of the email was "Hughes Asset Management." In the email, Jason Galanis wrote that a particular individual had "brought us an RIA [registered investment adviser] to acquire. possibly useful." Later in the email, Jason Galanis wrote, "can buy for 1.7x fee ($3.4 million) with 70% down. The deal referral comes from two competent sounding marketing people (resumes attached)." The email attached biographical information regarding Morton and her business partner.

    b. On or about July 16, 2014, Jason Galanis sent an email to the ARCHER ACCOUNT and the COONEY ACCOUNT. In the email, Jason Galanis said, "greek is forging ahead for us. see attached executed term sheet for the acquisition of 100% of Hughes Capital management. Firm manages $900 million on a discretionary basis for 28 institutional clients (pensions and endowments)." Later in the email, Jason Galanis said, "We have agreed to give the firm an opportunity to participate in native american bond new issues. I believe they will take $28 million of the Wakpamni/Ogala [sic] Sioux issue that Greenberg Traurig is working on." Archer responded via the ARCHER ACCOUNT, "This is very encouraging!"

USAO-SDNY_012230

Cooney responded via the COONEY ACCOUNT, "West Coast offense charging down the field!"

16. Also as described above, a portion of the misappropriated proceeds from the first tribal bond issuance were recycled and provided by Jason Galanis to entities affiliated with Archer and Cooney in order to enable Archer and Cooney to purchase subsequent Tribal Bonds issued by the WLCC. Specifically, in or about September 2014, Jason Galanis transferred approximately $15 million from the proceeds of the first Tribal Bond issuance via an intermediary to an entity controlled by Archer, who then used the funds to purchase a subsequent Tribal Bond issuance. (Ex. A ¶ 21(a)). In October 2014, in connection with Archer's attempt to deposit the bonds into a brokerage firm account under his control, Archer falsely represented that the funds he had used to purchase the bonds came from real estate sales. (Ex. A. ¶ 21(a)).

17. On several occasions between September 29, 2014 and October 24, 2014, Archer and Archer's assistant, Sebastian Momtazi ("Momtazi"), engaged in email correspondence with representatives of a brokerage firm regarding the purchase of the Tribal Bonds using the ARCHER ACCOUNT and the MOMTAZI ACCOUNT. For example:

  a. On or about September 29, 2014, the MOMTAZI ACCOUNT emailed a representative of the brokerage firm, cc'ing the ARCHER ACCOUNT, stating, in sum and substance and in part, that "we would like to make the following bond purchase...A purchase in the amount of $15,000,000.00 of: ISSUER: WAKPAMNI LAKE COMNT CORP S D SPL LTD REV".

  b. On or about October 1, 2014, the MOMTAZI ACCOUNT emailed a representative of the brokerage firm, cc'ing the ARCHER ACCOUNT, providing wire instructions for the purchase of the Tribal Bonds.

15

USAO-SDNY_012231

     c. On or about October 24, 2014, the MOMTAZI ACCOUNT emailed a representative of the brokerage firm, cc'ing the ARCHER ACCOUNT, attaching a client representation letter stating, in sum and substance and in part, "The funds used to purchase the bonds were from real estate sales through my business…"

18. Also in furtherance of the scheme, by letter dated October 1, 2014, Archer provided false and misleading information to the Independent Trustees of an asset manager affiliated with the placement agent for the Tribal Bonds, which had sought assurances from Archer that Jason Galanis would not be involved with either the placement agent or related entities. On or about September 26, 2014, Momtazi sent a copy of the letter from the MOMTAZI SENECA ACCOUNT to an employee of the placement agent, cc'ing the ARCHER SENECA ACCOUNT.

19. I also know, based on my review of bank records and documents provided by various entities, that a portion of the proceeds of the last Tribal Bond issuance, which were supposed to be invested on the WLCC's behalf in accordance with the documentation underlying the issuance, were instead used to purchase a significant percentage of the shares of the initial public offering of a technology company in which Jason Galanis, Hirst, Archer, Cooney and Dunkerley all held shares. Proceeds generated by a later sale of these shares were used, in part, to fund the interest payment on the first Tribal Bond Issuance when it became due. Jason Galanis communicated with Archer and Cooney by email regarding his plans for the initial public offering. Specifically:

     a. On or about February 25, 2014, Jason Galanis, the defendant, emailed the ARCHER ACCOUNT and the COONEY ACCOUNT attaching a draft Form S-1 registration statement for Technology Company-1's initial public stock offering. In the email, Jason Galanis stated, in substance and in part, "arch we put the attached together in about a week. Lots of work, but just a week. . . . will use

16

USAO-SDNY_012232

Burnham west coast for the IPO. will be in NASDAQ by summer. should be doing more of these using the machinery. jason."

20. I also know that that during the relevant time period, Archer and Cooney resided, at least in part, in different locations throughout the United States from Jason Galanis and the other co-conspirators in the charged scheme, and therefore were likely to frequently communicate with each other via electronic, rather than in-person, communications.

## C. Evidence, Fruits and Instrumentalities

21. Based upon the foregoing, I respectfully submit there is probable cause to believe that information stored on the Providers' servers associated with the Subject Accounts will contain evidence, fruits, and instrumentalities of the Subject Offenses, as more fully described in Section II of Attachment A to the proposed warrant.

22. In particular, I believe the Subject Accounts are likely to contain the following information:

- evidence of the agreement to engage in a fraudulent scheme involving the issuance of bonds on behalf of the Wakpamni Lake Community Corporation ("WLCC") and the misappropriation of the proceeds of those bonds, from January 1, 2014 to May 11, 2016;

- evidence of communications and/or meetings involving or related to the bonds issued on behalf of the WLCC, including but not limited to:

  o all emails with or pertaining to Jason Galanis, John Galanis, Gary Hirst, Hugh Dunkerley, Michelle Morton, Devon Archer, and Bevan Cooney;

  o all emails with or pertaining to entities involved in the issuance, placement, purchase or sale of the bonds;

17

USAO-SDNY_012233

- o all emails with or pertaining to entities involved in the receipt and/or use of the bond proceeds;

- evidence of crime (*e.g.*, agreement to engage in unlawful conduct, references to or discussion of unlawful conduct), communications constituting crime (*e.g.*, emails containing fraudulent representations); and identities and locations of co-conspirators or victims (communications with co-conspirators or victims, photos or other attachments, address book information).

- e-mail communications with co-conspirators;

- e-mails that can be helpful to establish user identity;

- email header information which can assist in placing the targets or confederates at a certain time and place;

- geographic location of user, computer, or device (*e.g.*, the content and header information can both indicate that the email was communicated through a particular physical location; metadata from photo attachments can reflect geographic location);

- identities and locations of co-conspirators or victims (communications with co-conspirators, photos or other attachments, address book information);

- location of other evidence (*e.g.*, emails reflecting registration of other online accounts potentially containing relevant evidence);

- passwords or other information needed to access the user's computer or other online accounts.

## III. Review of the Information Obtained Pursuant to the Warrant

23. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for service of a search warrant issued under § 2703, or for the collection or production of

12.28.2016

USAO-SDNY_012234

responsive records. Accordingly, the warrant requested herein will be transmitted to the Provider, which shall be directed to produce a digital copy of any responsive records to law enforcement personnel within 30 days from the date of service. Law enforcement personnel (including, in addition to law enforcement officers and agents, and depending on the nature of the ESI and the status of the investigation and related proceedings, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) will retain the records and review them for evidence, fruits, and instrumentalities of the Subject Offenses as specified in Section III of Attachment A to the proposed warrant.

24. In conducting this review, law enforcement personnel may use various methods to locate evidence, fruits, and instrumentalities of the Subject Offenses, including but not limited to undertaking a cursory inspection of all emails within the Subject Accounts. This method is analogous to cursorily inspecting all the files in a file cabinet in an office to determine which paper evidence is subject to seizure. Although law enforcement personnel may use other methods as well, particularly including keyword searches, I know that keyword searches and similar methods are typically inadequate to detect all information subject to seizure. As an initial matter, keyword searches work only for text data, yet many types of files commonly associated with emails, including attachments such as scanned documents, pictures, and videos, do not store data as searchable text. Moreover, even as to text data, keyword searches cannot be relied upon to capture all relevant communications in an account, as it is impossible to know in advance all of the unique words or phrases that investigative subjects will use in their communications, and consequently there are often many communications in an account that are relevant to an investigation but that do not contain any keywords that an agent is likely to search for.

12.28.2016

USAO-SDNY_012235

## IV. Conclusion

25. Based on the foregoing, I respectfully request that the Court issue the warrants sought herein pursuant to the applicable provisions of the Stored Communications Act, 18 U.S.C. § 2703(b)(1)(A) (for contents) and § 2703(c)(1)(A) (for records and other information), and the relevant provisions of Federal Rule of Criminal Procedure 41.


Special Agent Shannon Bieniek
Federal Bureau of Investigation


Sworn to before me this
_____ day of December, 2016

S/Barbara Moses


HONORABLE BARBARA MOSES
United States Magistrate Judge
Southern District of New York

20

12.28.2016

USAO-SDNY_012236

# EXHIBIT A

USAO-SDNY_012237

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - x
                                  :

UNITED STATES OF AMERICA        :

       - v. -            :

JASON GALANIS,             :      **SUPERSEDING**
GARY HIRST,               :      **INDICTMENT**
JOHN GALANIS,            :      S1 16 Cr. 371 (RA)
    a/k/a "Yanni,"       :
HUGH DUNKERLEY,          :
MICHELLE MORTON,        :
DEVON ARCHER, and       :
BEVAN COONEY,            :

       Defendants.        :

- - - - - - - - - - - - - - - - - - x

## COUNT ONE
### (Conspiracy to Commit Securities Fraud)

The Grand Jury Charges:

### Relevant Persons and Entities

1. At all times relevant to this Indictment, the Wakpamni Lake Community Corporation (the "WLCC") was a tribally-chartered economic development corporation, wholly-owned by the Wakpamni Lake Community, a subdivision of the Wakpamni Lake District, which are each subordinate units of the Oglala Sioux Tribe of the Pine Ridge Reservation, South Dakota.

2. At certain times relevant to this Indictment, Hughes Capital Management, Inc. ("Hughes") was an investment adviser registered with the U.S. Securities and Exchange Commission ("SEC") with its principal place of business in Alexandria,

1

Virginia.  On August 4, 2014, a limited liability corporation of

which MICHELLE MORTON, the defendant, was a fifty percent owner

(the "Morton Corporation") acquired Hughes.  Following the

acquisition, MORTON became the Chief Executive Officer of

Hughes.  At certain times relevant to the Indictment, GARY

HIRST, the defendant, was the Chief Investment Officer of

Hughes.

3.     At all times relevant to this Indictment, Atlantic

Asset Management, LLC ("Atlantic" and together with Hughes, the

"Investment Advisers") was an investment adviser registered with

the SEC with its principal place of business in Stamford,

Connecticut.  In or about April 2015, the Morton Corporation

purchased Atlantic and Hughes was merged into Atlantic.

Following the acquisition of Atlantic, MICHELLE MORTON, the

defendant, became the Chief Executive Officer of Atlantic.

MORTON and GARY HIRST, the defendant, were legally obligated to

the clients of the Investment Advisers to act in their best

interests.

<u>Overview of the Conspiracy</u>

4.     From at least in or about March 2014 through in or

about April 2016, JASON GALANIS, GARY HIRST, JOHN GALANIS, a/k/a

"Yanni," HUGH DUNKERLEY, MICHELLE MORTON, DEVON ARCHER, and

BEVAN COONEY, the defendants, and others known and unknown,

conspired to defraud the WLCC by (i) causing the WLCC to issue

2

more than $60 million in bonds based on false and misleading representations; (ii) failing to invest the bond proceeds on the WLCC's behalf in the manner agreed upon; and (iii) instead misappropriating the proceeds of the bonds for their own purposes.

5.    From at least in or about May 2014 through in or about April 2016, JASON GALANIS, GARY HIRST, and MICHELLE MORTON, the defendants, and others known and unknown, conspired to defraud certain of the clients of the Investment Advisers by gaining ownership and control of the Investment Advisers and causing client funds to be invested in the WLCC's bonds, without disclosing material facts to these clients, including that the bonds did not fit within the investment parameters of certain clients' investment advisory contracts and that certain substantial conflicts of interest existed.

### JASON AND JOHN GALANIS INDUCE THE WLCC TO ISSUE MORE THAN $60 MILLION OF BONDS THROUGH FALSE AND MISLEADING REPRESENTATIONS

6.    As a part of the scheme to defraud, JASON GALANIS and JOHN GALANIS, a/k/a "Yanni," the defendants, induced the WLCC, through false and misleading representations and omissions, to issue a total of approximately $60 million of bonds, over the course of four bond issuances (respectively, the "First Bond Issuance," the "Second Bond Issuance," the "Third Bond Issuance," and the "Fourth Bond Issuance" and, together, the

3

"Bond Issuances"). In furtherance of the scheme, JASON GALANIS apprised DEVON ARCHER and BEVAN COONEY, the defendants, of the status of the Bond Issuances and the likely proceeds to be obtained therefrom, and further discussed with them potential uses that could be made of the proceeds that were for the benefit of JASON GALANIS, ARCHER, COONEY and their co-conspirators.

7. According to the trust indentures and other documents relating to the Bond Issuances (collectively, the "Bond Agreements") entered into by the WLCC, proceeds of the Bond Issuances were to be provided to an annuity provider (the "Annuity Provider") established in the British Virgin Islands by HUGH DUNKERLEY, the defendant, to be invested in an annuity for the benefit of the WLCC which would generate sufficient income to pay interest and eventually the principal to bond holders. On or about August 6, 2014, GARY HIRST, the defendant, opened a bank account in Florida in the name of the Annuity Provider and provided himself and DUNKERLEY with signatory authority on the account (the "Dunkerley Account").

8. According to the Bond Agreements, a separate investment manager (the "Investment Manager") was to receive the bond proceeds from the Annuity Provider so that they could be invested on the WLCC's behalf.

4

9.   In connection with each of the Bond Issuances, the WLCC also entered into a placement agency agreement with a broker-dealer (the "Placement Agent") at which HUGH DUNKERLEY, the defendant, was employed, and in which DEVON ARCHER and BEVAN COONEY, the defendants, had an ownership interest.  Pursuant to the placement agency agreements – which in most cases were signed by DUNKERLEY – the Placement Agent would solicit investors for the WLCC bonds in exchange for a fee.  None of the eventual purchasers of the WLCC bonds, however, were solicited by the Placement Agent.

10.  At various times in furtherance of the scheme, JOHN GALANIS, a/k/a "Yanni," the defendant, falsely represented to the WLCC that JASON GALANIS, the defendant, was affiliated with the Placement Agent in order to create the false impression that JASON GALANIS'S role in the transaction was legitimate or authorized.  In addition, the placement agency agreements signed by HUGH DUNKERLEY, the defendant, stated that any notice that was to be provided to the Placement Agent should be sent to the attention of JASON GALANIS, thus ensuring that the conspirators were apprised of any developments concerning the Bond Issuances. Notwithstanding these representations, DEVON ARCHER, the defendant, who was affiliated with the Placement Agent, falsely represented to affiliates of the Placement Agent that, among other things, JASON GALANIS would not be involved with any

5

USAO-SDNY_012242

entities affiliated with the Placement Agent or source deals to the Placement Agent, despite ARCHER's knowledge of JASON GALANIS's role in procuring the Bond Issuances.

11. JASON GALANIS, the defendant, apprised DEVON ARCHER and BEVAN COONEY, the defendants, among others, about the progress of the Bond Issuances via email, among other means. For example:

a. On or about April 4, 2014, JASON GALANIS emailed ARCHER and COONEY, stating, "$20mm bond approved. Proceeds are $15mm to us and 5 mm to them."

b. On or about July 6, 2014, JASON GALANIS emailed ARCHER and COONEY, noting that the WLCC had approved the first bond issuance and stating, "[M]y primary objective is to get us a source of discretionary liquidity. Sick of begging."

c. On or about August 15, 2014, JASON GALANIS emailed ARCHER and COONEY, stating that the legal documents for the First Bond Issuance had been executed. COONEY replied, "This is pure genius alla [sic] mikey Milken!! The Native American Bonds!!! . . . Great work here Greek!!"

<u>CONTROL OF ATLANTIC AND HUGHES</u>

12. In furtherance of the scheme to defraud, JASON GALANIS, the defendant, obtained control of the Investment Advisers, in order to use client funds for his own purposes. JASON GALANIS did so by arranging for an entity he, DEVON

6

USAO-SDNY_012243

ARCHER, HUGH DUNKERLEY, and BEVAN COONEY, the defendants, among others, controlled to provide financing for MICHELLE MORTON, the defendant, to purchase the Investment Advisers. ARCHER and COONEY were well aware of JASON GALANIS's efforts to locate and gain control of the Investment Advisers, and that client funds were to be used for the purchase of the Bond Issuances. To further facilitate the fraudulent scheme, MORTON installed GARY HIRST, the defendant, with JASON GALANIS's knowledge and approval, as the Chief Investment Officer and later as the Chairman of the Investment Committee of Hughes.

13. Having obtained control of the Investment Advisers, JASON GALANIS, MICHELLE MORTON, and GARY HIRST, the defendants, purchased a total of approximately $43.2 million of the Bond Issuances with client funds. In particular:

a. In or about August 2014, MORTON and HIRST, at the direction of JASON GALANIS, directed the use of Hughes client funds to purchase approximately $27 million of bonds, representing the entirety of the First Bond Issuance.

b. In or about April 2016, MORTON, at the direction of JASON GALANIS, directed the use of Atlantic client funds to purchase $16.2 million of bonds, representing the entirety of the Fourth Bond Issuance.

14. MICHELLE MORTON and GARY HIRST, the defendants, failed to disclose the contemplated bond purchases to, or to consult

7

USAO-SDNY_012244

with, any Hughes clients, and MORTON likewise failed to make any disclosures to any Atlantic client, prior to causing the clients' purchases of the bonds, notwithstanding that the bond purchases were outside the investment parameters of many of the clients.

15.   MICHELLE MORTON and GARY HIRST, the defendants, also failed to disclose to the Investment Advisers' clients the numerous conflicts of interest that existed with regard to the Investment Advisers' role in the purchase of the bonds, despite their legal obligations to make such disclosures.  For example:

a.   HUGH DUNKERLEY, the defendant, was (i) a Managing Director at the Placement Agent; (ii) a managing member of an entity that invested in both Investment Advisers; (iii) an officer of the Annuity Provider; and (iv) a signatory on the Dunkerley Account.  DUNKERLEY was thus affiliated with the entity purportedly soliciting investors for the WLCC bonds; the entities whose clients actually purchased the bonds; and the entity receiving the proceeds of the bond issuances and purportedly investing those proceeds on the WLCC's behalf.

b.   HIRST was (i) the Chief Investment Officer, and later the Chairman of the Investment Committee, of Hughes and signed the trade tickets authorizing the purchase of the First Tribal Bond Issuance on behalf of Hughes clients; (ii) the Assistant Secretary of the Annuity Provider; and (iii) a

8

signatory on the Dunkerley Account. HIRST was thus affiliated both with the entities whose clients purchased the bonds and the entity receiving the proceeds of the bond issuances and purportedly investing those proceeds on the WLCC's behalf.

c. JASON GALANIS, the defendant, (i) held himself out as affiliated with the Placement Agent and was the notice party for certain of the agreements between the Placement Agent and the WLCC; (ii) orchestrated the purchase of Hughes and Atlantic; (iii) directed the purchase of the Bond Issuances using Atlantic and Hughes client funds; and (iv) exercised control over the Annuity Provider. JASON GALANIS was thus affiliated with the entity purportedly soliciting investors for the WLCC bonds; the entities whose clients actually purchased the bonds; and the entity receiving the proceeds of the bond issuances and purportedly investing those proceeds on the WLCC's behalf.

16. When clients of the Investment Advisers learned that certain of the Bond Issuances had been purchased in their accounts, several demanded that the bonds be liquidated. However, because there was no ready secondary market for the bonds, none were ever able to be sold or redeemed from the client accounts.

USAO-SDNY_012246

## MISAPPROPRIATION OF THE BOND PROCEEDS

17. As a further part of the scheme to defraud, JASON
GALANIS, the defendant, aided by HUGH DUNKERLEY, the defendant,
misappropriated the bond proceeds for his own benefit and for
the benefit of various co-defendants. In particular, the
entirety of the bond proceeds were deposited into the Dunkerley
Account. At no time were the funds deposited in the Dunkerley
Account transferred to the Investment Manager as specified in
the Bond Agreements. Instead, at JASON GALANIS's direction,
DUNKERLEY transferred more than $43 million of bond proceeds
from the Dunkerley Account to accounts controlled by both JASON
GALANIS (the "Jason Galanis Account") and JOHN GALANIS, a/k/a
"Yanni," the defendant. JASON GALANIS then transferred those
proceeds, often through layers of intermediaries, (i) to
accounts controlled by GARY HIRST, DEVON ARCHER, JOHN GALANIS,
and BEVAN COONEY, the defendants, among others; (ii) to other
business interests of JASON GALANIS and his co-defendants; and
(iii) for use in connection with his own personal expenses.

18. For example, HUGH DUNKERLEY, the defendant, acting at
the direction of JASON GALANIS, the defendant, transferred
approximately $2.3 million to a bank account associated with
JOHN GALANIS, a/k/a "Yanni," the defendant, which JOHN GALANIS
used for personal expenses. In addition, between on or about
August 27, 2014 and on or about October 30, 2015, JASON GALANIS

USAO-SDNY_012247

used approximately $8,750,000 transferred by DUNKERLEY to the
Jason Galanis Account for his own personal expenses, including:
at least $5,000,000 for expenses associated with JASON GALANIS's
home; at least $1,250,000 to pay various law firms; at least
$875,000 in payments to various members of the JASON GALANIS's
family; at least $500,000 in payments to the IRS; at least
$200,000 on automobile-related expenses; at least $75,000 for
restaurants and other food-related expenses; at least $75,000
for travel expenses; at least $40,000 in payments to JASON
GALANIS directly; at least $350,000 in clothing and jewelry
purchases; at least $55,000 in ATM withdrawals; and at least
$100,000 in miscellaneous personal expenses.

19.   JASON GALANIS, the defendant, and others, communicated
by email, among other means, about the use of the
misappropriated funds.  For example, on or about August 13,
2014, JASON GALANIS emailed DEVON ARCHER, the defendant, about a
business entity that HUGH DUNKERLEY, the defendant, was trying
to acquire, noting: "[first name] and Hugh [Dunkerley] have
locked it up and came to me for the money, which I have agreed
to arrange/provide (probably Indians)."

20.   During the same period, JASON GALANIS, the defendant,
transferred significant amounts from the Jason Galanis Account
to various co-defendants, including at least $1.3 million to an

11

entity controlled by GARY HIRST and HUGH DUNKERLEY, the defendants.

## PROCEEDS OF THE FIRST BOND ISSUANCE ARE RECYCLED TO PURCHASE THE SECOND AND THIRD BOND ISSUANCES

21. As a further part of the scheme to defraud, JASON GALANIS, HUGH DUNKERLEY, DEVON ARCHER, and BEVAN COONEY, the defendants, misappropriated $20 million from the proceeds of the First Bond Issuance and used the money to purchase the Second and Third Bond Issuances. Specifically:

a. In or about September 2014, JASON GALANIS, the defendant, transferred approximately $15 million from the proceeds of the First Bond Issuance via an intermediary to an entity controlled by DEVON ARCHER, the defendant. ARCHER then used the funds to purchase the entirety of the Second Bond Issuance. In or about October 2014, in connection with ARCHER's attempt to deposit the bonds into a brokerage firm account under his control, ARCHER falsely represented to the brokerage firm that the funds he had used to purchase the Second Bond Issuance came from real estate sales.

b. In or about October 2014, JASON GALANIS, the defendant, transferred $5 million from the proceeds of the First Bond Issuance to BEVAN COONEY, the defendant. COONEY then used the funds to purchase the entirety of the Third Bond Issuance.

12

USAO-SDNY_012249

22.  As a result of this recycling, although the face amount of WLCC bonds outstanding increased and the amount of interest payable by the WLCC increased, the actual bond proceeds available for investment on behalf of the WLCC did not increase.

23.  JASON GALANIS, BEVAN COONEY, and DEVON ARCHER, the defendants, then used the bonds purchased with the recycled proceeds of the First Bond Issuance to, among other things, support other business endeavors.  For example, ARCHER provided $2.6 million of bonds to the Placement Agent to meet its net capital requirements as a registered broker-dealer under applicable SEC regulations and COONEY transferred $5 million of bonds to another registered broker-dealer for the same purpose.

### The Defendants Make Interest Payments to the WLCC

24.  Pursuant to the Bond Agreements, regular interest payments were due on each of the Bond Issuances and were to be derived from annuity distributions.  For example:

    a.  The first interest payment of $1,546,417.13 was due on the First Bond Issuance on or before September 1, 2015.

    b.  The first interest payment of $903,000 was due on the Second Bond Issuance on or about September 30, 2015.

    c.  The first interest payment of $294,311.11 was due on the Third Bond Issuance on or about September 30, 2015.

    d.  The first interest payment of $1,013,166 was due on the Fourth Bond Issuance on or about May 1, 2016.

13

25. Interest payments on the Bond Issuances, however, did not derive from annuity distributions because the bond proceeds had not been invested as provided in the Bond Agreements. Instead, at the direction of JASON GALANIS, the defendant, the first interest payments on the First, Second and Third Bond Issuances were made using funds provided directly or through entities or accounts controlled by JASON GALANIS, HUGH DUNKERLEY, GARY HIRST, and DEVON ARCHER, the defendants. No interest payment on the Fourth Bond Issuance was ever made.

## Statutory Allegations

26. From at least in or about March 2014 through in or about April 2016, in the Southern District of New York and elsewhere, JASON GALANIS, GARY HIRST, JOHN GALANIS, a/k/a "Yanni," HUGH DUNKERLEY, MICHELLE MORTON, DEVON ARCHER, and BEVAN COONEY, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit an offense against the United States, to wit, securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

27. It was a part and object of the conspiracy that JASON GALANIS, GARY HIRST, JOHN GALANIS, a/k/a "Yanni," HUGH DUNKERLEY, MICHELLE MORTON, DEVON ARCHER, and BEVAN COONEY, the defendants, and others known and unknown, willfully and

14

knowingly, directly and indirectly, by use of the means and
instrumentalities of interstate commerce, and of the mails, and
of the facilities of national securities exchanges, would and
did use and employ manipulative and deceptive devices and
contrivances, in connection with the purchase and sale of
securities, in violation of Title 17, Code of Federal
Regulations, Section 240.10b-5, by (a) employing devices,
schemes, and artifices to defraud; (b) making untrue statements
of material fact and omitting to state material facts necessary
in order to make the statements made, in the light of the
circumstances under which they were made, not misleading; and
(c) engaging in acts, practices, and courses of business which
operated and would operate as a fraud and deceit upon persons,
in violation of Title 15, United States Code, Sections 78j(b)
and 78ff.

<u>Overt Acts</u>

28. In furtherance of the conspiracy and to effect its
illegal object, the following overt acts, among others, were
committed in the Southern District of New York and elsewhere:

a. In approximately March 2014, JOHN GALANIS, a/k/a
"Yanni," the defendant, met with employees of and advisers to
the WLCC at a Native American economic development conference in
Las Vegas, Nevada.

15

USAO-SDNY_012252

b.    On or about July 21, 2014, MICHELLE MORTON, the defendant, sent a text message to JASON GALANIS, the defendant, stating, "Should know how$ [sic] we can proceed with bonds soon getting information."  JASON GALANIS responded, "i'm confident you will figure it out."

c.    On or about August 8, 2014, HUGH DUNKERLEY, the defendant, signed an agreement pursuant to which he bound the broker-dealer at which he was employed to serve as the placement agent for an issuance of bonds by the WLCC.

d.    On or about August 22, 2014, GARY HIRST, the defendant, sent an email containing trade tickets signed by him authorizing the purchase of certain bonds issued by the WLCC on behalf of certain clients of Hughes.

e.    On or about October 1, 2014, DEVON ARCHER, the defendant, caused the transfer of $15,000,000 from a brokerage account located in New York, New York for the purchase of $15,000,000 of bonds issued by the WLCC, which bonds were also held, for a period of time, in the brokerage account located in New York, New York.

f.    On or about October 9, 2014, BEVAN COONEY, the defendant, caused the transfer of $5,000,000 from an account in his name for the purchase of $5,000,000 of bonds issued by the WLCC.

(Title 18, United States Code, Section 371.)

16

USAO-SDNY_012253

## COUNT TWO
### (Securities Fraud)

The Grand Jury further charges:

29.   The allegations contained in Paragraphs 1 through 25 and 28 are repeated, realleged, and incorporated by reference as though fully set forth herein.

30.   From at least in or about March 2014 through in or about April 2016, in the Southern District of New York and elsewhere, JASON GALANIS, GARY HIRST, JOHN GALANIS, a/k/a "Yanni," HUGH DUNKERLEY, MICHELLE MORTON, DEVON ARCHER, and BEVAN COONEY, the defendants, and others known and unknown, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails, and of the facilities of national securities exchanges, used and employed manipulative and deceptive devices and contrivances, in connection with the purchase and sale of securities, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons,

17

to wit, the defendants engaged in a scheme to misappropriate the proceeds of several bond issuances by the WLCC and also caused investor funds to be used to purchase the bonds, for which there was no secondary market through which such bonds could be redeemed, without disclosure to those investors of material facts, including the existence of multiple conflicts of interest, and which investments, in some cases, were outside the investment parameters of the accounts in which they were placed.

(Title 15, United States Code, Sections 78j(b) & 78ff;
Title 17, Code of Federal Regulations, Section 240.10b-5; and
Title 18, United States Code, Section 2.)

## COUNT THREE
### (Conspiracy to Commit Investment Adviser Fraud)

The Grand Jury further charges:

31. The allegations contained in Paragraphs 1 through 25 and 28 are repeated, realleged, and incorporated by reference as though fully set forth herein.

32. From at least in or about May 2014 through in or about April 2016, in the Southern District of New York and elsewhere, JASON GALANIS, GARY HIRST, and MICHELLE MORTON, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit an offense against the United States, to wit, investment adviser fraud, in violation of Title 15, United States Code, Sections 80b-6 and 80b-17.

18

33. It was a part and object of the conspiracy that JASON GALANIS, GARY HIRST, and MICHELLE MORTON, the defendants, and others known and unknown, willfully and knowingly would and did use the mails and other means and instrumentalities of interstate commerce, directly and indirectly, (a) to employ a device, scheme, and artifice to defraud clients and prospective clients; (b) to engage in a transaction, practice, and course of business which operated as a fraud and deceit upon clients and prospective clients; and (c) to engage in an act, practice, and course of business which was fraudulent, deceptive, and manipulative, in violation of Title 15, United States Code, Sections 80b-6 and 80b-17.

Overt Acts

34. In furtherance of the conspiracy and to effect its illegal object, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a. On or about July 21, 2014, MICHELLE MORTON, the defendant, sent a text message to JASON GALANIS, the defendant, stating, "Should know how$ [sic] we can proceed with bonds soon getting information." JASON GALANIS responded, "i'm confident you will figure it out."

b. On or about August 22, 2014, GARY HIRST, the defendant, sent an email containing trade tickets signed by him

19

USAO-SDNY_012256

authorizing the purchase of certain bonds issued by the WLCC on behalf of certain clients of Hughes.

(Title 18, United States Code, Section 371.)

### COUNT FOUR
### (Investment Adviser Fraud)

The Grand Jury further charges:

35.  The allegations contained in Paragraphs 1 through 25, 28 and 34 are repeated, realleged, and incorporated by reference as though fully set forth herein.

36.  From at least in or about May 2014 through in or about April 2016, in the Southern District of New York and elsewhere, JASON GALANIS, GARY HIRST, and MICHELLE MORTON, the defendants, willfully and knowingly used the mails and other means and instrumentalities of interstate commerce, directly and indirectly, (a) to employ a device, scheme, and artifice to defraud clients and prospective clients; (b) to engage in a transaction, practice, and course of business which operated as a fraud and deceit upon clients and prospective clients; and (c) to engage in an act, practice, and course of business which was fraudulent, deceptive, and manipulative, to wit, HIRST and MORTON, who were employees of a registered investment adviser and thus had fiduciary duties to their investment advisory clients, with the knowledge and approval of JASON GALANIS, intentionally withheld material information from their clients

20

USAO-SDNY_012257

regarding purchases of bonds issued by the WLCC, including the existence of multiple conflicts of interest and the fact that the purchases were outside the investment parameters set forth in the investment advisory agreements of certain clients, for the purpose of profiting from the placement of such bonds.

(Title 15, United States Code, Sections 80b-6 and 80b-17; and Title 18, United States Code, Section 2.)

## FORFEITURE ALLEGATION AS TO COUNTS ONE THROUGH FOUR

37.  As a result of committing one or more of the offenses alleged in Counts One through Four of this Indictment, JASON GALANIS, GARY HIRST, JOHN GALANIS, a/k/a "Yanni," HUGH DUNKERLEY, MICHELLE MORTON, DEVON ARCHER, and BEVAN COONEY, the defendants, shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code Section 2461, any property, real or personal, that constitutes or is derived from proceeds traceable to the commission of the offenses alleged in Counts One through Four of this Indictment.

### Substitute Assets Provision

38.  If any of the above-described forfeitable property, as a result of any act or omission by any of the defendants:

a.    cannot be located upon the exercise of due diligence;

USAO-SDNY_012258

b.    has been transferred or sold to, or deposited with, a third party;

c.    has been placed beyond the jurisdiction of the court;

d.    has been substantially diminished in value; or

e.    has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), and Title 28, United States Code Section 2461, to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described above.

> (Title 18, United States Code, Section 981(a)(1)(C);
>  Title 21, United States Code, Section 853(p);
>  Title 28, United States Code, Section 2461.)

_____
GRAND JURY FOREPERSON

_Preet Bharara_
_____
PREET BHARARA
United States Attorney

22

USAO-SDNY_012259

Form No. USA-33s-274 (Ed. 9-25-58)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

JASON GALANIS,
GARY HIRST,
JOHN GALANIS, a/k/a "Yanni,"
HUGH DUNKERLEY,
MICHELLE MORTON,
DEVON ARCHER,
and BEVAN COONEY,

Defendants.

SUPERSEDING INDICTMENT

S1 16 Cr. 371 (RA)

(Title 15, United States Code, Sections
78j(b), 78ff, 80b-6 and 80b-17; Title
17, Code of Federal Regulations, Section
240.10b-5;
Title 18, United States Code, Sections
371 and 2.)

_____          PREET BHARARA
Foreperson                               U.S. Attorney.

23

Ex. F

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**USDC-SDNY**
**DOCUMENT**
**ELECTRONICALLY FILED**
**DOC#:**
**DATE FILED:** 02/03/2017

---

UNITED STATES OF AMERICA,

v.

JASON GALANIS, *et al.*,

Defendants.

No. 16-CR-371 (RA)

ORDER

---

RONNIE ABRAMS, United States District Judge:

On or about December 28, 2016, the Government sought, and Magistrate Judge Moses issued, a search warrant for electronic data pertaining to several email accounts, including accounts associated with Defendants Devon Archer and Bevan Cooney. *See* Dkt. 128 at 1; Dkt. 130 at 1. The warrant was served on at least two service providers: Google and Apptix. *See* Dkt. 130 at 1. Before making a production pursuant to the warrant, Google notified Archer and Cooney and provided them with redacted copies of the warrant. *See* Dkt. 126 at 1; Dkt. 128 at 1. After receiving notice from Google, Archer and Cooney filed motions (the "Initial Motions to Stay") asking the Court to (1) compel the Government to provide them with unredacted copies of the warrant and supporting application and (2) stay the execution of the warrant while Archer and Cooney decided whether to file motions to quash. *See* Dkt. 126 at 1; Dkt. 128 at 1. On January 30, 2017, the Government agreed to provide the warrant and application to all defense counsel in the case, and disclosed that Apptix had already made a production pursuant to the warrant of materials from an email account associated with Archer. *See* Dkt. 130 at 1–2.

The Court held a conference on January 31, 2017 to discuss the Initial Motions to Stay. During the conference, Archer modified his Initial Motion to Stay to request that the Court also enjoin the Government from reviewing the contents of the Apptix production pending a potential

motion to quash. The Court denied the Initial Motions to Stay on the record, but ordered any production by Google and review by the Government of the Apptix production to be held in abeyance to allow for the instant motions. The Court assumes familiarity with the Court's ruling.

On February 1, 2017, Archer and Cooney filed motions to stay the Court's January 31 ruling pending appeal (the "Motions to Stay Pending Appeal"), Dkts. 132–33, which the Court now denies. In determining whether to grant such a stay, a court must weigh "the likelihood of success on the merits, irreparable injury if a stay is denied, substantial injury to the party opposing a stay if one is issued, and the public interest." *Mohammed v. Reno*, 309 F.3d 95, 100 (2d Cir. 2002). Having weighed these factors, the Court concludes that a stay is not warranted.

For the reasons stated in the Government's opposition to the Motions to Stay Pending Appeal, Archer and Cooney have not demonstrated a likelihood of success on the merits. *See* Dkt. 134 at 2–6. As the Court's January 31 ruling made clear, this Court will not mandate that the Government cease its investigation and trial preparation with respect to the materials from Google and Apptix while Archer and Cooney decide whether to challenge the search warrant. Moreover, appellate jurisdiction is, at best, uncertain.

The Court also finds that any injury that Archer and Cooney may suffer in the absence of a stay is speculative, and not irreparable. The alleged injury to Archer and Cooney is the Government's potential misuse of privileged or other non-responsive materials, which is not actual and imminent, especially where, as here, the Government has committed to adhere to procedures designed to avoid such harm. *See id.* at 6–7. Should Archer and Cooney determine at a later date that the Government has encountered privileged or other non-responsive materials, they can seek to suppress those materials, request a taint hearing, or even ask the Court to disqualify members of the Government team who encountered the materials.

2

The harm to the opposing party and public interest factors also weigh against a stay. The Sixth Amendment and the Speedy Trial Act recognize the interest of the public and criminal defendants in the prompt resolution of criminal cases. *See* U.S. Const. amend. VI; 18 U.S.C. § 3161 *et seq.* Halting the Government's review of the materials sought by the warrant would delay the Government's investigation, and, quite possibly, this entire case. The Court is also wary of setting a precedent that could unduly hinder the timely prosecution of future cases.

The Initial Motions to Stay are denied for the reasons previously stated on the record, and the Motions to Stay Pending Appeal are denied for the reasons set forth in this order. The Court will, however, allow Archer and Cooney seventy-two hours to seek a stay pending appeal from the Second Circuit. *See, e.g.*, *Diorinou v. Mezitis*, 237 F.3d 133, 138 (2d Cir. 2001). The Clerk of Court is respectfully directed to close the motions pending at Docket Numbers 132 and 133.

SO ORDERED.

Dated:  February 3, 2017
        New York, New York

Ronnie Abrams
United States District Judge

3